**OIL CITY BRASS WORKS, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 21755.**

United States Court of Appeals
Fifth Circuit.

Feb. 8, 1966.

John H. Benckenstein, Beaumont, Tex., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Paul J. Spielberg, Atty., Arnold Ordman, Gen. Counsel, Melvin Pollack, Atty., N.L.R.B., Washington, D. C., for respondent.

Before RIVES, WISDOM and GEWIN, Circuit Judges.

RIVES, Circuit Judge:

Oil City Brass Works [1] petitioned this Court to review and set aside an order of the National Labor Relations Board [2]

1. Hereafter Oil City or the Company.

2. Hereafter the Board.

issued against it. The Board in its answer requested enforcement of the order.

Oil City's plant at Beaumont, Texas, includes a foundry, a machine shop and a forge shop. John Hammock was a supervisory employee in charge of what is called the "ring-side crew" on the night shift. Oil City refused to recall Hammock from layoff status. After proper proceedings, the Board found that Oil City had committed an unfair labor practice and ordered the Company to reinstate Hammock with back pay. 147 N.L.R.B. No. 76.

In the Spring of 1962, the Union [3] began its drive to organize Oil City. At a meeting on March 3, 1962, Hammock and some 15 employees signed cards authorizing the Union to act as their bargaining agent. On March 6 the Company received a request from the Union to recognize it as bargaining agent of the forge shop employees, which it refused.

The Union then filed unfair labor practice charges. In return for withdrawing the charges, the Company agreed to recognize the Union and place certain men who had been laid off on a preferential rehiring list. All these actions were subject to a check of the Union's authorization cards.

A card check followed and it was found that the Union was entitled to recognition. However, on June 13, 1962, the Union again filed charges. The Union alleged, *inter alia*, that Oil City had refused to bargain and that it had discriminatorily laid off or discharged persons supporting the Union. The Board after a three-day hearing found for the Union and Oil City complied with the Board's order. 141 N.L.R.B. 131.

It is out of the testimony by Hammock given at those proceedings that the present case arises. At the time the Union filed unfair labor charges for the second time, supervisor Hammock was still on layoff status.

3. International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, Local 587, AFL–CIO.

George E. Bryant, III, son of the Company's president George E. Bryant, Jr., is assistant to the president. On July 20, Bryant, III, called Hammock and offered him work as a blacksmith in charge of a new night crew to be assembled. Bryant, III, called Hammock the next day and explained that he could only "get * * * three of the old men back." Bryant asked Hammock if it "would be all right with * * * [him] if he went to the unemployment office and got three rookies" and that he "would bear with * * * [Hammock] until the men caught on to the work." This latter conversation took place on Saturday, July 21, and the Board hearing was on Monday, July 23, 1962.

Monday morning Hammock called Bryant, III, and told him that he had been subpoenaed to testify that day. Bryant, III, told him, in effect, not to worry and that he would try to make arrangements with the doctor for Hammock to get a required physical examination that afternoon after the hearing. At the hearing Hammock testified adversely to the Company's interests.

When Hammock called the Company that afternoon, Bryant, III, gave the phone to his father Bryant, Jr., who told Hammock that they didn't have a crew ready yet. He also told Hammock there were no hard feelings over his testimony. But on Thursday, the day after the Board proceeding ended, Bryant, III, told Hammock that the Company no longer wished to employ him. Hammock testified that Bryant, III, said, "No, John, I am sorry. Being as you are a blacksmith and a supervisor, and went with labor, we don't have no place in our organization for you." [4]

The Board found that the Company was well aware of Hammock's union membership before it offered to rehire him. Thus, the Board concluded that Hammock was denied reinstatement because of his having testified adversely to the Company. Oil City, on the other hand, contended that Hammock's union affiliation first came to its attention at the hearings. Hammock was denied reinstatement, according to the Company, because of his union membership and because he lied previously when he told the Company that he was not a union member.

■ If Hammock was fired solely because of his union affiliation, there has been no unfair labor practice on which the Board can predicate its order. The National Labor Relations Act does not protect supervisory personnel. NLRB v. Edward G. Budd Mfg. Co., 169 F.2d 571 (6 Cir. 1948), cert. den., Foreman's Ass'n of America v. Edward G. Budd Mfg. Co., 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441 (1949) ; NLRB v. Griggs Equipment, Inc., 307 F.2d 275 (5 Cir. 1962). It is settled that the Act does not preclude a company from firing or refusing to recall from layoff status a supervisory employee solely because that employee is affiliated with a union. Texas Co. v. NLRB, 198 F.2d 540 (9 Cir. 1952) ; NLRB v. Inter-City Advertising Co., 190 F.2d 420 (4 Cir. 1951), cert. den., 342 U.S. 908, 72 S.Ct. 301, 96 L.Ed. 679 (1952) ; NLRB v. Edward G. Budd Mfg. Co., supra.

■ Moreover, if Hammock were fired merely for lying, the Act would afford him no protection. Griffin Hosiery Mills, 102 N.L.R.B. 1592 (1953), at 1594;

---

4. Bryant, III, recalled his conversation with Hammock as follows:

"John, you were a trusted member of management, and being a trusted member of management you took it on your own volition to forsake this trust and become a member of the Boilermakers Union * * *. It is a clear case in my mind of a conflict of interests, and you can't be both, you can't sit on both sides of the table * * *. I think that it's the best interest for the Company and for yourself that we decide right here and now that I have no choice but to tell you that there is no job here at Oil City Brass Works, no place for you as a blacksmith, because * * * I can't have a supervisor here that binds me or binds my company and is responsible for the acts, his acts are the responsibility of the Company, and having him with conflicting interests."

cf. Valentine Sugars, Inc., 102 N.L.R.B. 313 (1953).

Before reaching the thorny legal questions which embellish this case, it is necessary to resolve the factual conflicts. The Trial Examiner found that Bryant, III, was clearly aware of Hammock's union activity before he testified at the Board hearing. In reasoning to this conclusion, the Trial Examiner used the following language:

"With respect to the Respondent's defense, I am unable to credit the testimony of Bryant III, that he first became aware of Hammock's union sympathies through Hammock's testimony at the hearing. A card check was made subsequent to March 22, 1962, and was participated in by Respondent's payroll check. A letter from Respondent's attorney to the Union, states, in part, that a card check undertaken pursuant to a March 22 understanding had shown that one card examined had been executed by a supervisor and was accordingly not counted, and that one had been printed and not signed. Colloquy by counsel for Respondent indicated the printed card was that of Blacksmith W. E. Maddox. The credited testimony of Blacksmith Maddox, a supervisor, reveals that during the month of March or April, Bryant, Jr., conversed with Maddox in the presence of John Hammock concerning some faulty work. During the conversation Bryant, Jr., stated that Hammock and Maddox had signed the union authorization cards because he had 'pulled [their] names out of a hat.' I conclude that Bryant, here had reference to the card check hereinbefore mentioned and that Bryant, Jr., learned of Hammock's union allegiance subsequent to the card check, but before this conversation. Bryant III, denies having been told by his father that Hammock had signed an authorization card, but considering the opposition and hostility to the Union that existed in March and April, as found by the Board in the prior case which finding I officially notice and take cognizance of, and considering the high station of Bryant III, in the managerial hierarchy of Respondent, I am impelled to the conclusion that Bryant III, became aware in advance of the prior hearing that the card check had revealed Hammock's execution of a union authorization card. I cannot believe that Bryant, Jr., remained entirely reticent about this development, or that in the antiunion atmosphere that then existed, Bryant III, held himself so aloof from the crucial developments relating to the Union's organizational efforts that he remained unapprised, even by his own father, of Hammock's action."

The Trial Examiner goes on to conclude that Hammock was fired in part, if not entirely, because of his testimony. Again, in his supplemental decision the Trial Examiner re-adopts this finding. The Board, after its review, acquiesced in the Trial Examiner's rationale and findings on this matter.

The record thus presents a conflict. Bryant, III, testified that he did not know of Hammock's union activity until the hearing. This testimony was not credited by the Board. Instead, the Board chose to draw certain secondary inferences based on the undisputed primary fact inferences proved before the Trial Examiner. Where the ultimate facts found by the Board are supported by circumstantial evidence from which the conclusions may reasonably and legitimately be drawn, they are binding on the reviewing court. This conclusiveness is required even where the court might have drawn different inferences, for the Act commits the resolution of equally conflicting inferences to the Board. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); NLRB v. Camco, Inc., 340 F.2d 803 (5 Cir. 1965); Saginaw Furniture Shops, Inc. v. NLRB, 343 F.2d 515 (7 Cir. 1965); Duo-Bed Corp. v. NLRB, 337 F.2d 850

(10 Cir. 1964), cert. den. 380 U.S. 912, 85 S.Ct. 897, 13 L.Ed.2d 798; Martin Sprocket & Gear Co. v. NLRB, 329 F.2d 417 (5 Cir. 1964); see also, Great Atlantic & Pacific Tea Co. v. NLRB, 354 F.2d 707 (5 Cir. 1965) at 709; NLRB v. Mira-Pak, Inc., 354 F.2d 525 (5 Cir. 1965) at 527.

■ The test is whether taking the record as a whole the Board reasonably and legitimately could have drawn the secondary inference that it drew. This case presents one more situation involving the "crucial" period when the union seeks to organize a plant. Congress sought uniformity in the fact-finding process by entrusting it to a Board which sees all of the cases involving these highly specialized problems, and thereby develops expert knowledge. The Board is in a better position than are the courts to know what inferences are most appropriate during this crucial stage of organization. We cannot say that the secondary inferences drawn by the Board in the instant case are unreasonable.

We find that there is substantial evidence, taking the record as a whole, to support the Board's finding that Hammock was fired in part, if not entirely, because of his testimony.

A major part of the confusion in this case comes from the injection of a false issue in the Trial Examiner's conclusion, as stated by the Board:

"From his consideration of the Board decisions in Better Monkey Grip, 115 NLRB 1170, enfd. 243 F. 2d 836 (C.A. 5), cert. denied 353 [355] U.S. 864 [78 S.Ct. 96, 2 L.Ed. 2d 69] 355 U.S. 900 [78 S.Ct. 261, 2 L.Ed.2d 197] and Dal-Tex Optical, 131 NLRB 715, enfd. 310 F.2d 58 (C.A. 5), the Trial Examiner concluded that a supervisor's discharge for testifying violates Section 8(a) (1) when employees have knowledge of the fact the supervisor gave testimony and was discharged therefor, and when circumstances exist from which employees would reasonably believe a similar fate would befall them if they gave testimony."

The Trial Examiner, in his supplemental decision, found that the rank-and-file employees were not put in fear and that, therefore, no 8(a) (1) violation took place. Directly the opposite factual conclusion was reached by the Board, when it found that rank-and-file employees would fear retribution if they testified.

■ While the cases are not entirely clear, we hold that whether rank-and-file employees would be put in fear by Hammock's discharge is irrelevant and merely clouds the real issue. Any time an employee, be he supervisor or not, is fired for union activity rank-and-file employees are likely to fear retribution if they emulate his example. But the Act does not protect supervisors, it protects rank-and-file employees in their exercise of rights. If the fear instilled in rank-and-file employees were used in order to erect a violation of the Act, then any time a supervisor was discharged for doing an act that a rank-and-file employee may do with impunity the Board could require reinstatement. Carried to its ultimate conclusion, such a principle would result in supervisory employees being brought under the protective cover of the Act. Congress has declined to protect supervisors and the courts should not do by indirection what Congress has declined to do directly.[5] The principle that precludes reinstatement where a supervisor is fired for union activity, even though it instills fear in rank-and-file employees, also precludes reinstatement where that fear is instilled because of testimony given by the supervisor.

■ The real issue in this case is whether the Company interfered with, restrained or coerced rank-and-file employees in the exercise of their guaranteed rights through the refusal to recall supervisor Hammock. In National Labor Relations Board v. Talladega Cotton Factory, 213 F.2d 209, 40 A.L.R.2d 404 (5 Cir. 1954), the Company fired supervisors for refusing to commit an unfair la-

5. See Annotation 40 A.L.R.2d 415.

bor practice. We found that this act by the Company directly violated 8(a)(1) not because it put rank-and-file employees in fear but because it interfered with, restrained or coerced them in the enjoyment of their rights secured under the statute. The Act does not require the Board to stand by powerless and watch an employer coerce supervisors into committing unfair labor practices under pain of being fired, but permits the Board to protect rank-and-file employees by allowing supervisors to perform their statutory duties without fear. It is this principle that requires us to enforce the Board's order.

The Board's order should be enforced as an inherent protection of its source of information necessary to protect rank-and-file employees in the exercise of their statutory rights. The policy underlying the protection of witnesses was ably stated by Judge Bazelon in John Hancock Mut. Life Ins. Co. v. National Labor Relations Board, 89 U.S.App.D.C. 261, 191 F.2d 483 (1951). There, the court had under consideration the question whether the words "or otherwise discriminate" contained in section 8(a)(4), 29 U.S.C.A. § 158(a)(4) included a refusal to hire. Judge Bazelon stated (191 F.2d at 485–486):

"Such breadth of statutory language is consistent only with an intention to prevent the Board's channels of information from being dried up by employer intimidation of * * * witnesses. With such a purpose in mind, it is inconceivable that Congress would have restricted its condemnation only to certain 'means' for accomplishing discriminations which would strike at the heart of Board processes. Indeed, Congress demonstrated it had no such narrow interest in mind by employing the broadest language it could find. The use of the words 'or otherwise discriminate' in the disjunctive after 'discharge' indicates clearly that Congress sought to extend Board scrutiny to all forms of discrimination."

Judge Bazelon noted that "[t]he purpose of § 8(a)(4) was 'to assure an effective administration of the Act by providing immunity to those who initiate or assist in proceedings under the Act.' Briggs Mfg. Co., 75 NLRB 569, 570–571." Accord NLRB v. Lamar Creamery Co., 246 F.2d 8 (5 Cir. 1957).

The Second Circuit had the question of whether the discharge of a supervisor for testifying violated section 8(a)(1) and (4), 29 U.S.C.A. § 158(a)(1) and (4), before it in Pedersen v. National Labor Relations Board, 234 F.2d 417 (2 Cir. 1956). The Second Circuit explained (234 F.2d at 420):

"Unless there is a clear Congressional mandate to the contrary the Board should be required to utilize every resource at its command to protect witnesses * * * who have been placed in jeopardy because the Board has required them to appear and give testimony."

Judge Lumbard, speaking for the court, concluded that the Board's protective powers under sections 8(a)(1) and 8(a)(4) are coextensive with its subpoena powers.

We agree with the Second Circuit that unless the power of the Board to protect its witnesses is coextensive with its power to compel testimony, the overriding purpose of the Act will be frustrated. Rank-and-file employees have a right to have their privileges secured by the Act vindicated through the effective administrative proceedings provided by Congress. Included in this privilege is the right to have witnesses testify without fear of being penalized by their employer. As in the instant case, it may often be necessary to have supervisory personnel testify. It follows, therefore, that any discrimination against supervisory personnel because of testimony before the Board directly infringes the right of rank-and-file employees to a congressionally provided, effective administrative process, in violation of section 8(a)(1), 29 U.S.C.A. § 158(a)(1). NLRB v. Better Monkey Grip Co., 115 NLRB 1170, enfd., 243 F.2d 836 (5 Cir.

1957), cert. den., 355 U.S. 864, 78 S.Ct. 96, 2 L.Ed.2d 69 (1957); NLRB v. Dal-Tex Optical Co., 310 F.2d 58 (5 Cir. 1962).

While restricted by section 2(3), 29 U.S.C.A. § 152(3), to rank-and-file employees, section 8(a) (1) is broad enough to cover any restraint on employees' rights. We can think of few restraints more direct than actions calculated to prevent rank-and-file employees from having supervisors testify on their behalf.

On this question of testimony, good administration requires uniform application and absolute predictability for those who must run the gauntlet of employer wrath by testifying. The discharge of a supervisor for testifying violates the Act as a matter of law, and the Board needed to find no more than that the Company refused to recall Hammock because of his testimony. The Board's order will be enforced.