**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FAULKNER HOSPITAL, Respondent.**

No. 82–1022.

United States Court of Appeals, First Circuit.

Argued Sept. 9, 1982.

Decided Oct. 13, 1982.

**52**

Howard E. Perlstein, Washington, D. C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Mary L. Browne, Washington, D. C., were on brief, for petitioner.

Arthur P. Menard, Boston, Mass., with whom Anne K. Morrill, and Morgan, Brown, Kearns & Joy, Boston, Mass., were on brief, for respondent.

Before COFFIN, Chief Judge, SWYGERT,* Senior Circuit Judge and BREYER, Circuit Judge.

COFFIN, Chief Judge.

The National Labor Relations Board ("the Board") petitions for enforcement of its order against respondent, Faulkner Hospital. The Administrative Law Judge ("ALJ") found that the hospital had discharged employee John Walsh for giving another employee a written statement that was used in a grievance proceeding and had thus violated § 8(a)(1) of the National Labor Relations Act ("the Act"). Adopting that finding, the Board ordered Walsh's reinstatement with back pay. Because that finding is supported by substantial evidence, we enforce the Board's order.

### I.

At the time of the relevant incidents, Walsh had been employed by the hospital as a security guard for four years, bearing the title "security supervisor" for the final two-and-a-half. While on duty on the midnight to 8 a. m. shift, Walsh, in the company of another guard, investigated the presence of an unauthorized motor vehicle and encountered its driver, Gerald McCarthy. Walsh knew McCarthy, who worked as a painter for Balco Corporation, a subcontractor responsible for maintenance work and plant operations at the hospital. McCarthy appeared to be intoxicated, and Walsh asked him to leave. Because it was discovered later that morning that two typewriters

---

* Of the Seventh Circuit, sitting by designation.

were missing from the hospital, Walsh, following the instruction of security chief Joseph McBrine, wrote an incident report of the night's activities including the McCarthy incident.

Later Walsh learned that McCarthy had been fired for drinking on hospital property and that his report had been interpreted to indicate that he had actually seen liquor in McCarthy's possession. Walsh spoke with security chief McBrine on several occasions and with hospital vice-president David Folker on one occasion in attempts to correct what he considered a misuse of his report. During this period Walsh received several phone calls from McCarthy accusing him of lying and threatening him and his family.

One month after the initial incident, McCarthy telephoned Walsh and asked him to write a statement for use at an unemployment compensation hearing saying that Walsh had not seen McCarthy on the hospital grounds with liquor. Walsh agreed and gave McCarthy a statement indicating that though his report indicated that he thought McCarthy was intoxicated on the night in question, he had not actually seen alcohol in McCarthy's possession. Later the same day, after McBrine had received a call from a Balco official indicating that McCarthy had taken Walsh's statement to his union for use in a pending grievance of McCarthy's discharge, Walsh was suspended without pay. He was subsequently fired.

## II.

Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), makes it "an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." Among those guaranteed rights is the right "to engage in ... concerted activities for ... mutual aid or protection." 29 U.S.C. § 157. The hospital argues that the Board erred on three counts in finding it guilty of an 8(a)(1) violation: (1) Walsh was a "supervisor" and therefore not an "employee" protected by the Act; (2) Walsh's giving a statement to McCarthy was not concerted

activity for mutual aid or protection; and (3) the hospital had legitimate business reasons for firing Walsh.

We review the Board's contrary findings to determine that they are "supported by substantial evidence when reviewed in light of the entire record." *Seven-Up Bottling Co. v. NLRB,* 506 F.2d 596, 600 (1st Cir. 1974). If they are, we must accept them even if we might have reached different conclusions had the matter been before us *de novo. NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Amber Delivery Service, Inc.,* 651 F.2d 57, 61 (1st Cir. 1981). Though "the Board's supported analysis of the facts is entitled to great weight", that analysis must be supported by a reasonable reading of the record as a whole. *Maine Yankee Atomic v. NLRB,* 624 F.2d 347, 360 (1st Cir. 1980).

### A. Supervisory status

"Supervisors" are specifically excluded from protections afforded "employees" under the Act. 29 U.S.C. § 152(3). A "supervisor" is

"any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11).

"By well-settled construction, this section is to be read in the disjunctive, with the existence of any one of the statutory powers sufficient to confer supervisory status regardless of the frequency of its exercise." *Maine Yankee, supra,* 624 F.2d at 360.

Despite Walsh's job title of "security supervisor", the ALJ, citing numerous specific findings of fact, concluded on the record "that Walsh did not sufficiently possess

the authority to use his independent judgment with respect to the exercise by him of one or more of the specific authorities and indicia enumerated in Section 2(11) of the Act." The ALJ noted that when Walsh was given the title "supervisor", "there was no discussion about his authority and he was given no special instructions."

The hospital argues that Walsh had supervisory authority to responsibly direct and assign other guards on the midnight to eight a. m. shift; that, indeed, if Walsh did not possess such authority there was no supervision on that shift. The hospital discounts the ALJ's finding that "[t]he performance of the chores on the midnight shift was handled by the three to four security employees on a voluntary and 'democratic' basis", arguing that it is the ultimate existence of supervisory authority not the manner of its exercise that controls. While we agree that it is the existence of supervisory authority and not the frequency of its exercise that is important, *Maine Yankee, supra,* 624 F.2d at 364, we find the manner in which duties on the third shift were assigned to be an indication that any residual authority that Walsh possessed over such assignment was of a "routine . . . nature" not "requir[ing] the use of independent judgment." Further indication is the ALJ's specific finding that Walsh "periodically switched shifts with rank-and-file security officers and supervisors", resulting in occasions on which there was, in fact, "no designated 'supervisor' . . . present on the night shift."

We conclude that the Board's finding that Walsh was not a supervisor for purposes of the Act is supported by substantial evidence.

### B. *Concerted activity for mutual aid or protection*

In support of its contention that Walsh did not engage in concerted activity for mutual aid or protection, the hospital argues that: (1) Walsh did not intend mutual aid or protection in coming to McCarthy's aid but acted only out of fear of McCarthy; and (2) Walsh intended to aid McCarthy only at an unemployment compensation hearing, and such aid is not protected by the Act; and (3) McCarthy was properly discharged and therefore Walsh did not act in concert with a statutory employee.

■ The hospital's first argument assumes that if an employee is motivated solely by personal concern when he comes to the aid of another employee his action is not protected by the Act. We are not at all sure that intent rather than effect should control in evaluating what activity is protected by the Act. Even assuming that intent is critical, the ALJ had ample evidence in the record upon which to base his conclusion that Walsh did not act primarily out of fear but because he wanted "to tell the truth."[1]

The hospital argues similarly that Walsh gave the statement to McCarthy only for use at an unemployment compensation hearing not for use in grievance proceedings, and that we therefore must decide whether aid given for that purpose is protected by the Act. Because the circumstances of another employee's discharge were at issue in the unemployment compensation hearing, we would have no trouble finding that Walsh's aid for purposes of the hearing bore "a sufficiently close nexus to the terms and conditions of employment to be 'protected concerted activity'", *Supreme*

---

1. Uncontradicted testimony indicated that Walsh insisted throughout that his attempts to correct his perceived misuse of his report were primarily motivated not by fear but by a desire "to tell the truth."

The ALJ made the following general finding with respect to Walsh's credibility:
"I credit the testimony of Walsh as detailed above. Walsh's testimony stands in large part uncontradicted by the testimony of Folker or McBrine. Insofar as the above testimo-

ny of Walsh differs with the testimony of Folker or McBrine, I am persuaded on this entire record, including the demeanor of the witnesses, that the detailed account of this sequence by Walsh is accurate, reliable and trustworthy."
"The ALJ's credibility judgments must stand unless they are unreasonable . . . ." *NLRB v. Wright Line,* 662 F.2d 899, 909 (1st Cir. 1981), *cert denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

*Optical Co. v. NLRB,* 628 F.2d 1262, 1263 (1980), were the question presented. "The circumstances of the termination of a particular employee potentially affects the relationship between all employees and their employer. It is reasonable for employees to be concerned about the consequences of their possible termination." *Id.* But we think that what controls here is the employer's motivation. If, as we conclude within, there was substantial evidence that the hospital acted to thwart mutual aid in a grievance proceeding, we think that the protected status of such aid is what is at issue. Furthermore, there is no evidence that Walsh objected to the use of his statement for grievance purposes, a use he was aware of soon after giving the statement.

 The hospital's third argument, if accepted, would severely cripple employee participation in the grievance-arbitration process, a process integral to the collective bargaining process that the Act was designed to encourage, *see Steelworkers v. Warrior & Gulf Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). It would mean that any employee who aided a discharged "ex-employee" in an unsuccessful grievance of that discharge could himself be discharged. We find this outcome difficult to reconcile with the purposes of the Act. Nor is such an interpretation supported by the language of the Act. "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise, and *shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute ....* " 29 U.S.C. § 152(3) (emphasis added). "The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, ...

regardless of whether the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 152(9).

We conclude that Walsh's proffering to McCarthy of a statement regarding circumstances relevant to McCarthy's discharge and to the grieving of that discharge was concerted employee activity for mutual aid and protection.

### C. *The employer's motivation*

 It remains for us to consider whether there was substantial evidence to support the Board's conclusion that the hospital fired Walsh because of his exercise of section 7 rights and without a legitimate business reason. In evaluating a charge of unlawful discharge the Board must give "careful consideration" to "the employer's 'good reason' as well as" to "the general counsel's evidence of improper motive." *NLRB v. Wright Line,* 662 F.2d 899, 907 (1st Cir. 1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Though the employer has the burden of coming forward with credible evidence to meet a prima facie case of improper motive, the burden of persuasion remains with the general counsel to show a causal link between an improper motive and discharge. *Id.* at 904–06.[2]

It is undisputed that Walsh's discharge resulted from his giving a statement to McCarthy and surrounding circumstances. Having accepted the Board's conclusion that giving the statement was protected activity, it follows that a prima facie case has been made for a § 8(a)(1) violation. In addition, there was specific evidence in the record that Walsh's firing was precipitated by the hospital's concern that Walsh's statement gave McCarthy's union a basis for successfully grieving his discharge.[3]

**2.** *Wright Line* was decided on Sept. 21, 1981, after the ALJ's decision in this case (July 30, 1981) but before the Board's adoption of that decision (Nov. 20, 1981). Because we conclude that there was substantial evidence for the ALJ's conclusion that the hospital's "good reasons" were pretextual, we find no need to remand in light of our decision in *Wright Line. See NLRB v. Magnesium Casting Co.,* 668 F.2d

13, 16 (1st Cir. 1981); *NLRB v. American Spring Bed Mfg. Co.,* 670 F.2d 1236, 1245 n.2 (1st Cir. 1982); *NLRB v. Clark Manor Nursing Home Corp.,* 671 F.2d 657, 663 (1st Cir. 1982).

**3.** Later the same morning that Walsh gave the statement to McCarthy, security chief McBrine told Walsh that he had received a phone call from Balco official Robert Campbell informing him "that McCarthy ... had a letter from"

■ The hospital contends, however, that it discharged Walsh for legitimate business reasons. Its discharge letter told Walsh he had been "terminated" for: (1) "disobeying a lawful command" not to converse with McCarthy; (2) meeting with McCarthy and giving him the written statement; (3) leaving his post to give McCarthy the statement "without proper authorization to do so"; and (4) "exercis[ing] poor judgment against Hospital policy which was not in the best interest of the Safety-Security Department." The ALJ found, in effect, that these reasons were a sham: "In short, Folker [a hospital vice-president], annoyed at and embarrassed by Walsh's 'compulsion to tell the truth' about this incident, fired him, in violation of Section 8(a)(1) of the Act".

There is ample evidence to impeach the credibility of the first three reasons given by the hospital. The ALJ found on the record that no one had *commanded* Walsh not to speak to or meet with McCarthy, that "Walsh's eight-to-ten minute meeting with McCarthy in front of the hospital . . . did not cause him to leave his post", and that "guard employees would leave their duty stations for personal matters for more substantial periods without being disciplined or fired."

■ Indeed, on appeal, the hospital urges the legitimacy of only the fourth reason. It claims that in discharging Walsh it did no more than enforce a standing rule essential to the integrity of its safety-security system. That rule, read into the minutes of a regular monthly meeting of the Safety Security Department approximately a year-and-half before the events relevant here, stated:

"All reports submitted become hospital property, shall not be altered without [the Chief of Safety and Security's] permission, and shall not be discussed outside of [the Safety and Security] Department."

Walsh "contradicting [the] original report"; that McCarthy "had gone to [his] Union"; and that McCarthy was "going to cause some litigation problems for Faulkner." There was also evidence that prior to that morning Balco and hospital officials had discussed possible union

The ALJ's decision did not mention the hospital's rule or discuss the contention that Walsh's actions compromised the integrity of the hospital's security reporting system. The Board's order affirming the ALJ's decision did deal directly though summarily with this justification for discharge.

"While Respondent further contends that Walsh's letter compromised the integrity of its security system, the evidence in this regard contains no factual basis demonstrating any specific manner in which Walsh's letter actually or potentially compromised the security of Respondent's facility in a manner warranting an intrusion upon Walsh's exercise of concerted activities otherwise protected by the Act."

The hospital is no more forthcoming on appeal in demonstrating that Walsh's actions—even if they can be fairly characterized as violating the cited rule—were a breach of hospital security serious enough to motivate the firing of a long-term employee whose previous work record was admittedly "exemplary". The hospital points to no instances in which it has discharged other employees for single violations of a similar rule. We are thus satisfied that there was substantial evidence upon which to conclude that Walsh was in fact fired because his superiors were "annoyed" and "embarrassed" that Walsh had given another employee a statement which undermined their position in a pending union grievance.

But because the grievant was not one of the hospital's own employees, we do not think this quite makes an end of the matter. We are not prepared to say that an employer's "embarrassment" in its dealing with another company could never be a legitimate business reason for discharging an employee who came to the aid of the other company's employee in disregard of official channels. *Cf. Keosaian v. NLRB,*

support for a grievance by McCarthy and their allied position in opposing any such grievance, and that after that morning the same officials discussed the problems that Walsh's statement posed for their grievance position.

630 F.2d 36 (1st Cir. 1980). Here, however, there is evidence that Walsh, *before he gave a statement directly to McCarthy,* made repeated attempts to persuade his superiors to permit the correction of what he considered the misuse of his report. Furthermore, the hospital was closely allied with Balco in effecting the discharge of McCarthy, an employee who worked at the hospital.[4] In another case involving less closely allied employers it might be easier to conclude that the discharge was motivated by a legitimate concern over business credibility and not by a desire to thwart mutual aid and protection among employees.

On this record, the Board had substantial evidence upon which to conclude that the hospital discharged Walsh for activity protected by § 7 of the Act, thus violating § 8(a)(1) of the Act.

*The petition for enforcement is granted.*

---

**4.** The ALJ concluded on the record that "[t]he hospital, particularly Folker, had fully collaborated with Balco in causing McCarthy's discharge and considered itself, in effect, an 'ally' of Balco in this endeavor."