**HOWARD JOHNSON COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 82–1589.

United States Court of Appeals,
First Circuit.

Argued Dec. 9, 1982.
Decided March 2, 1983.

Robert W. Garrett, Boston, Mass., with whom Paul J. Kingston, Kingston & Garrett and Richard A. Gaucher, Boston, Mass., were on brief, for petitioner.

Howard E. Perlstein, Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Sandra Shands Elligers, Washington, D.C., were on brief, for respondent.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order finding Howard Johnson Company (the company) guilty of unfair labor practices. The Board's order requires, *inter alia,* that the

company cease and desist from engaging in unfair labor practices; offer discharged supervisory employee Sandra Paquin, a former head housekeeper at its South Bend, Indiana motel, immediate, full, and unconditional reinstatement; and post appropriate notices.

The case was heard before an administrative law judge (ALJ) in August 1981. The ALJ found that the company violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1),[1] by proscribing the display of union buttons, by threatening reprisals for union activities, by threatening that no union would be permitted, by interrogating statutory employees about union activity, by attempting to enlist Sandra Paquin, a supervisor, to engage in espionage of union meetings, and by discharging Paquin for refusing to engage in espionage. All of the foregoing conduct occurred in connection with an organizing campaign of Teamsters Local 364 at the company's South Bend, Indiana motor lodge. The Board affirmed the ALJ's rulings, findings, and conclusions.

The company does not contest any of the findings of section 8(a)(1) violations except those related to its actions toward Paquin. It is undisputed that Paquin is a supervisor and thus not entitled to the protections given to statutory employees under the National Labor Relations Act. *See Beasley v. Food Fair of North Carolina,* 416 U.S. 653, 658–62, 94 S.Ct. 2023, 2026–28, 40 L.Ed.2d 443 (1974); *NLRB v. Faulkner Hospital,* 691 F.2d 51, 53 (1st Cir.1982); *NLRB v. Sheraton Puerto Rico Corp.,* 651 F.2d 49, 51 (1st Cir.1981). We must first decide whether substantial evidence supports the Board's conclusion that the company discharged Paquin because she refused to comply with the

company's demand that she identify which of her co-workers attended a meeting, *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Pilgrim Foods, Inc.,* 591 F.2d 110, 112 (1st Cir.1978), and if so, whether a discharge for this reason is an unfair labor practice. Substantial evidence

> means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 [71 S.Ct. 456, 459, 95 L.Ed. 456] ... (1951). We must take contradictory evidence in the record into account, *id.* at 487–88, [71 S.Ct. at 464] ... but "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620 [86 S.Ct. 1018, 1026, 16 L.Ed.2d 131] ... (1966). "Even if reasonable minds could also go the other way, we must uphold the Board if its ultimate finding is supported by substantial evidence on the record as a whole." *NLRB v. J.K. Electronics,* 592 F.2d 5, 7 (1st Cir.1979).

*NLRB v. Concord Furniture Industries,* 675 F.2d 426, 428 (1st Cir.1982).

The basic facts are not in dispute. Paquin held the position of supervisor of the housekeeping department at the company's South Bend motor lodge from November 27, 1978, until December 17, 1980. In early November 1980 Paquin attended at least two union meetings, and at one of those meetings on November 9, 1980, she signed a union authorization card.

---

1. *Section 8(a)(1) provides:*

    (a) It shall be an unfair labor practice for an employer—
        (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title . . . .
    29 U.S.C. § 158(a)(1).
        Section 157 provides:
        Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through

representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
    29 U.S.C. § 157.

On November 21, 1980, Paquin was called to a meeting with Kevin B. Callanan, the company's vice president of labor relations, William Collins, the South Bend motor lodge manager, and Richard Gaucher, the company's attorney. Callanan informed Paquin that he was in South Bend to gather information concerning the petition the Teamsters had filed to represent the South Bend employees. Callanan instructed Paquin not to ask any employees about the union, but if she were approached, she should listen and report what she heard to Collins. When Callanan asked her about her own involvement in the union and whether she had any information about the origin of the union activity, Paquin answered untruthfully, stating that she had never seen a union authorization card and was not aware of any employee's signing a card.

On December 17, 1980, Paquin again met with Callanan and Collins. Callanan told Paquin he was there to investigate her involvement in union activities. Callanan testified that Paquin immediately disavowed any involvement in union activity. He testified further that he knew this response was untruthful because he had reviewed a copy of the transcript of the November 24, 1980, representation proceeding at which Paquin testified that she had signed a union authorization card at a union meeting on November 9.

Callanan continued to question Paquin about her union activity, and she finally admitted that she had attended a union meeting. Callanan asked Paquin if employees of Howard Johnson were at this meeting, and Paquin stated that there were. Callanan then requested Paquin to reveal the identity of these employees. Paquin refused stating, according to Callanan, that she would not be a "snitch" on these other employees. Paquin testified that when Callanan again demanded that she reveal the identity of the employees she refused and left the meeting.

Callanan testified that he continued to question Paquin about her own union involvement and warned her that he believed she was not being truthful. She admitted signing a union card, but was unclear whether it was a union authorization card. Callanan's testimony as to what happened next is not terribly precise, but it appears that the conversation broke down. Callanan repeatedly warned Paquin to be truthful and reminded her she was a supervisor. Paquin stated that Callanan was being rude and that she was not going to answer any more questions; she then left the room.

Callanan testified that after Paquin left he directed Collins to find Paquin and tell her that if she did not return to continue the conversation, she would be terminated. He stated that at that time his reasons for terminating her if she refused to return were her failure to cooperate in the investigation into her union activities and her insubordination, but he did not reveal these reasons to Collins. Callanan stated that if Paquin returned, he would have asked additional questions and expected her to answer his original questions truthfully. He would have again requested that she reveal the identities of the employees present at the union meeting.

Collins testified that, pursuant to Callanan's request, he summoned Paquin to his office and told her that if she did not return to the meeting with Callanan and continue the conversation, she would be terminated. Paquin's response, according to Collins, was that she would not talk to Callanan, and if telling on her friends meant she would be fired, she guessed she was fired. Collins stated that at this point he fired Paquin because she refused to talk to Callanan. Paquin's testimony recounting this meeting agrees substantially with that of Collins. Paquin admitted that she did not know what question or questions she would be required to answer if she returned to the meeting. Upon this evidence, the Board found that

it was not until Mrs. Paquin twice refused to "finger" the employees at those meetings—the second time, when recalled to the interview ... for the express purpose of giving her another opportunity to comply with Respondent's requirement that she disclose the names of the other

**4**

employees at those meetings—that she was then and there precipitately discharged after her continued refusal to supply that information.

The Board concluded "that the true and controlling reason for Respondent's discharge of Mrs. Paquin was her refusal to identify the employees she observed attending union meetings . . . ." Howard Johnson contends that the evidence shows it fired Paquin because of her disloyalty (*i.e.,* her union support) and her failure to cooperate in the investigation of her union activities. We think the record evidence amply and substantially supports the Board's conclusion.

The company learned of Paquin's disloyalty and initial insubordination well before it discharged her. At Paquin's first meeting with Callanan and Collins on November 21, 1980, she failed to disclose her union involvement and her knowledge of union activity at the motor lodge. The company learned of her dishonesty and her support of the union at least by November 28 when it received a transcript of the November 24 representation hearing at which Paquin testified about her union activity.

On December 17 the only question for which the company had no answer was—who were the employees at the November 9 union meeting. The company's claim that it fired Paquin because of insubordination is nothing more than a claim that it fired her because she refused to cooperate and answer questions. The question she refused to answer was what employees were present at the union meeting. The company claims that it had a right to demand answers because Paquin was a supervisor and owed her loyalty to management. That is, the company essentially concedes that it fired Paquin for refusing to return to the interrogation, but claims that this was a discharge for disloyalty and not an unfair labor practice. We see no significant

difference between firing an employee for not answering questions about the identity of union supporters and not attending an interrogation about the same subject.[2]

We hold that the Board's finding that Paquin was discharged for refusing to reveal the identity of union supporters is substantially supported by the record evidence. We consider next whether the company's discharge of Paquin constituted an unfair labor practice.

The National Labor Relations Act does not afford protection to supervisors and therefore does not prohibit an employer from discharging a supervisor for her own union activity. *See Beasley v. Food Fair of North Carolina,* 416 U.S. at 658–62, 94 S.Ct. at 2026–28; *NLRB v. Sheraton Puerto Rico Corp.,* 651 F.2d at 51; *Oil City Brass Works v. NLRB,* 357 F.2d 466, 468 (5th Cir.1966). Nonetheless, if an employer's actions toward a supervisor interfere with, coerce, or restrain statutorily protected employees in the exercise of their section 7 rights, the employer is guilty of an unfair labor practice. *See Belcher Towing Co. v. NLRB,* 614 F.2d 88, 91 (5th Cir.1980); *Gerry's Cash Markets, Inc. v. NLRB,* 602 F.2d 1021, 1023 (1st Cir.1979); *NLRB v. Talladega Cotton Factory, Inc.,* 213 F.2d 209, 216–17 (5th Cir.1954). An employer's discharge of a supervisor for refusing to participate in an unfair labor practice is itself an unfair labor practice because, as we noted in *Gerry's Cash Markets, Inc. v. NLRB,* 602 F.2d 1021 (1st Cir.1979), "if employers are allowed to force supervisors to engage in unfair labor practices, this necessarily results in direct interference with the affected rank-and-file employees in the exercise of their § 7 rights." *Id.* at 1023; *see also Oil City Brass Works v. NLRB,* 357 F.2d at 470–71.

The issue, thus, is whether Howard Johnson was requiring Paquin to commit an unfair labor practice when it demanded

---

**2.** Because the company essentially concedes that Paquin was fired because she refused to be questioned about the identity of union supporters, the company's reliance upon *NLRB v. Wright Line,* 662 F.2d 899 (1st Cir.1981), is misplaced. *Wright Line* concerned the burden of proof in cases in which the employer presented evidence that an employee was fired, at least in part, because of a lawful motive. Here, the only real question is whether the undisputed motive was lawful.

that she reveal the identity of her co-workers at the union meeting. If so, the company committed an unfair labor practice when it discharged her for failing to comply with its request.

■ The Board concluded that the company's demand of Paquin was tantamount to a demand that she engage in surveillance of statutory employees' union activity. In *NLRB v. Hasbro Industries,* 672 F.2d 978, 987 (1st Cir.1982), we adopted the Fifth Circuit's holding that employer surveillance of union activities is an unfair labor practice

> because it indicates an employer's opposition to unionization, and the furtive nature of the snooping tends to demonstrate spectacularly the state of the employer's anxiety. From this the law reasons that when the employer either engages in surveillance or takes steps leading his employees to think it is going on, they are under the threat of economic coercion, retaliation, etc.

*NLRB v. Mueller Brass Co.,* 509 F.2d 704, 708 (5th Cir.1975) (quoting *Hendrix Manufacturing v. NLRB,* 321 F.2d 100, 104–05 n. 7 (5th Cir.1963)); *see also Belcher Towing Co. v. NLRB,* 614 F.2d at 91 & n. 4; *Russell Stover Candies, Inc. v. NLRB,* 551 F.2d 204, 206 (8th Cir.1977); *NLRB v. Lowe,* 406 F.2d 1033, 1034–35 (6th Cir.1969).

We think it clear that if an employer were to direct a supervisor to attend a union meeting, observe which employees were present, and report her observations to the employer, the employer would be engaging in unlawful surveillance. *Cf. Russell Stover Candies, Inc. v. NLRB,* 551 F.2d at 207 (instructing supervisor to engage in systematic surveillance of employee union activity, questioning about results, and encouraging continuance during nonworking hours is unfair labor practice); *NLRB v. Brookside Industries, Inc.,* 308 F.2d 224, 227–28 (4th Cir.1962) (upholding Board's conclusion that directing supervisor to obtain information about union organization from her husband, statutory employee, is unfair labor practice). The major difference between the company's actions in this

case and those of an employer in the clearly illegal surveillance just described is that here the company did not direct Paquin to attend the union meeting. The absence of such a directive, however, does not compel a different outcome.

Precisely those same reasons that led us to conclude in *Hasbro* that employer surveillance of union activities was an unfair labor practice apply when an employer *coerces* a supervisor to reveal the names of employees obtained while engaging in such surveillance. The employer will have obtained precisely the same information as if it had directed the surveillance in advance. The employees are likely to have the same fears, feelings, and beliefs about the employer, should they find out about the coercion, as they would have should they find out about directed surveillance. That being so, we see no difference between previously directed surveillance and an employer effort to obtain identical information through later coercion. Thus, the employer would have engaged in an unfair labor practice had it succeeded in obtaining the results of Paquin's surveillance through threats of discharge. The employer did not succeed only because Paquin would not cooperate. But, Paquin's refusal to cooperate with her employer, under threat of coercion, amounts to a refusal to participate in this unfair labor practice. And, as we have just pointed out, to discharge a supervisor for refusing to engage in an unfair labor practice is itself an unfair labor practice.

The company claims that it was privileged to compel Paquin to comply with its demand. It argues first that Paquin is a supervisor and as such owes total loyalty to the company. While we do not dispute that a supervisor owes such a loyalty and can be fired for supporting a union herself, that duty does not extend beyond the bounds of the law. An employer may not invoke the special relationship it has with a supervisor to shield itself from liability for an unfair labor practice. It may not require a supervisor to engage in unfair labor practices as the price for retaining her job.

■ Second, the company contends that it had the right to compel this information

because it was investigating the possibility of supervisory taint in the union's showing of interest. Whatever right a company may have to obtain information concerning supervisory taint is outweighed by the protection afforded employees in the exercise of their section 7 rights. An employer may not engage in unfair labor practices to obtain information it is lawfully entitled to possess.

■ Finally, we see no merit in the company's argument that Paquin is not entitled to reinstatement. Reinstatement is appropriate to remedy the unlawful discharge of a supervisor. *See Belcher Towing Co. v. NLRB,* 614 F.2d at 91–92; *Russell Stover Candies, Inc. v. NLRB,* 551 F.2d at 207; *cf. Local No. 207, International Association of Bridge Workers v. Perko,* 373 U.S. 701, 707, 83 S.Ct. 1429, 1432, 10 L.Ed.2d 646 (1963) (recognizing Board's authority to order reinstatement of supervisor discharged for refusing to engage in unfair labor practice).

*The Board's order is enforced in its entirety.*