Grady DELLING, Individually, and Country Boy Mr. "D" Corporation d/b/a Country Boy Markets; Grady Delling, Individually, and Glenwood, Inc. d/b/a Country Boy Markets; Grady Delling, Individually, d/b/a Country Boy Markets, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 87–1370.

United States Court of Appeals, Tenth Circuit.

March 10, 1989.

Charles W. Ellis of Lawrence, Ellis & Harmon, P.A., Oklahoma City, Okl., for petitioners.

Michael F. Messitte (Barbara A. Atkin, Supervisory Atty., L. Pat Wynns, Atty., Rosemary M. Collyer, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, and Elliott Moore, Deputy Associate General Counsel, of the N.L.R.B., Washington, D.C., on the brief), for respondent.

Before BALDOCK, EBEL and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

Country Boy Markets, a chain of supermarket stores in Oklahoma, petitions this Court for review of a Decision and Order of the National Labor Relations Board (hereinafter referred to as the Board). The Board held that Country Boy violated Section 8(a)(1) of the National Labor Relations Act (hereinafter referred to as the Act), 29 U.S.C. § 158(a)(1), by discharging one of its supervisory employees, Everett Kelley, for refusing to falsify termination slips in the store's effort to establish a pretext for the unlawful discharge of five non-supervisory employees which would have interfered with the exercise of their rights under Section 7 of the Act, 29 U.S.C. § 157. The Board ordered Kelley's reinstatement. We affirm the Board's Decision and Order and order enforcement.

The background facts are fully set forth in the Administrative Law Judge's (ALJ) Decision, which was approved and adopted by the Board, and will not be repeated here. The Board's Decision and Order, which affirms the rulings, findings, and conclusions of the ALJ, is reported at 283 NLRB No. 22. Brief reference to the facts is necessary, however, to understand our disposition of the present petition.

## What Happened?

Country Boy was nonunion, and Kelley was the store manager of Country Boy No. 2. In late 1985 the United Food and Commercial Workers Union, Local 1680, began a campaign to organize the employees of all Country Boy Markets. The General Counsel's evidence before the ALJ showed that Kelley, on orders from Country Boy's general manager, Wayne Dibler, fired five employees because each had signed union cards. The discharged employees were in each instance given a pretextual reason by Kelley for their discharge.[1]

A few days later, after a meeting between Country Boy Markets' management and attorneys, where the managers were given instructions on how to handle a union organizational campaign, and also after one of the previously discharged employees had filed, or was about to file, a charge of unfair labor practice against Country Boy, Dibler instructed Kelley to prepare termination slips for each of the discharged employees setting forth the reason for discharge. Kelley testified that in response to this request he told Dibler that he wasn't going to "fill them out and perjure myself in front of the National Labor Board here." Kelley stated that Dibler did not respond to his statement that he was not going to commit perjury. Notably, termination slips had not been used before at Country Boy Markets.

At the hearing before the ALJ, Kelley conceded that Dibler "did not tell him what to put on the termination slips." He assumed, nonetheless, that he was supposed to put down the pretextual reason given by him for discharge because "he knew ... [Dibler] didn't want me to put in there I fired them for signing union cards." After Dibler's repeated requests for Kelley to fill out the termination slips on the discharged employees, which Kelley refused to do, Kelley was fired. The reason given Kelley for his discharge was "poor inventory."

Country Boy's evidence before the ALJ painted a different picture. Dibler testified he never instructed Kelley to fire any employee for signing a union card, and that Kelley, as store manager, fired the five employees on his own initiative because of their poor job performance. Dibler also indicated that although he repeatedly asked Kelley to fill out the termination slips on the discharged employees, he never asked Kelley to falsify information on the termination slips. Rather, he assumed Kelley would give the reason for discharge as the poor job performance of each discharged employee.

Obviously, there was highly conflicting testimony before the ALJ. The ALJ, as the initial fact finding body, decided to accept the testimony of Kelley and to discount the testimony of Dibler. The ALJ listed his reasons for believing Kelley over Dibler, characterizing Dibler's testimony as "contradictory and implausible." The Board approved and adopted the ALJ's findings.

Addressing the Board's adoption of the ALJ's findings, Country Boy argues that the Board completely ignored the testimony of its witnesses, particularly the testimony of Dibler and Tomlinson. That is not our view of the matter. Rather, the Board simply chose to place higher credibility in

---

1. By way of example, Kelley testified that Dibler came to Store No. 2 with a list of employees who were to be fired for signing union cards. On that occasion, Dibler asked if Kelley had anything on Tom Moran he could fire him for and Kelley said "no." Kelley then began defending Moran as one of the store's best workers. Kelley "was [then] instructed to fire every-

body that had signed a union card." Kelley further testified that, following instructions from Dibler, he fired Tom Moran and since he "had to think up something fast ... I told him it was for his being rude to people," when in fact, according to Kelley, Moran had not been rude to anyone.

the General Counsel's witnesses than in Country Boy's witnesses. Such is, of course, the prerogative of any fact finder. *See generally Artra Group, Inc. v. NLRB,* 730 F.2d 586, 590–91 (10th Cir.1984).

■ Country Boy's main argument concerning the evidence is that the Board erred in inferring that Dibler instructed Kelley to falsify the termination slips of the discharged employees when Kelley himself testified that Dibler never used the term "falsify" and that he (Kelley) simply assumed from all of the circumstances that he was to write on the termination slips the pretextual reasons he had given the discharged employees. We think the inference thus made by the Board was a permissible one, under all the facts and circumstances before it. *See NLRB v. L. & B. Cooling, Inc.,* 757 F.2d 236, 241 (10th Cir. 1985) (citing *NLRB v. Dover Corp.,* 535 F.2d 1205 (10th Cir.), *cert. denied,* 429 U.S. 978, 97 S.Ct. 488, 50 L.Ed.2d 586 (1976)); *NLRB v. Gold Spot Dairy, Inc.,* 417 F.2d 761, 762 (10th Cir.1969).

Having found that Dibler had, as a matter of fact, instructed Kelley to fire the employees who had signed union cards, it would logically follow that Dibler thereafter wanted Kelley to fill out the termination slips and list thereon the pretextual reasons Kelley had previously given the employees for their discharge. The only other option is that Dibler wanted Kelley to give as a reason for the discharge the fact that the particular employee had signed a union card. This possibility would be difficult for any fact finder to swallow.

In sum, the record, in our view, supports the critical findings made by the ALJ, which were then accepted and approved by the Board. In such circumstances we are not at liberty to disturb them. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *United States Soil Conditioning v. NLRB,* 606 F.2d 940, 944 (10th Cir.1979).

## The Law

Kelley was admittedly a supervisory employee and, therefore, excluded from the statutory definition of "employee." 29 U.S.C. § 152(3). Accordingly, Country Boy argues that even if Kelley's testimony is accepted lock, stock and barrel, Kelley is still not covered by the Act and is entitled to no relief. We do not agree.

■ Kelley was a supervisor and hence not an "employee" as defined in the Act. *Beasley v. Food Fair of North Carolina, Inc.,* 416 U.S. 653, 658–62, 94 S.Ct. 2023, 2026–28, 40 L.Ed.2d 443 (1974); *Automobile Salesmen's Union Local 1095, United Food and Commercial Workers Union, AFL–CIO v. NLRB,* 711 F.2d 383, 386 (D.C. Cir.1983). Courts have recognized, however, that an employer's discharge of a supervisor for refusing to participate in an unfair labor practice is itself an unfair labor practice. Stated somewhat differently, the discharge of a supervisor is unlawful under the Act if it directly interferes with the rights of non-supervisory employees. *Automobile Salesmen's Union,* 711 F.2d 386–88; *Howard Johnson v. NLRB,* 702 F.2d 1 (1st Cir.1983); *Gerry's Cash Markets, Inc. v. NLRB,* 602 F.2d 1021 (1st Cir.1979); *King Radio Corp. v. NLRB,* 398 F.2d 14 (10th Cir.1968); *see also Russell Stover Candies, Inc. v. NLRB,* 551 F.2d 204 (8th Cir.1977); *NLRB v. Carter Lumber, Inc.,* 507 F.2d 1262 (6th Cir.1974); *Oil City Brass Works v. NLRB,* 357 F.2d 466 (5th Cir.1966).

In *Automobile Salesmen's Union,* six employees and a supervisor attended an organizational meeting conducted by a union. The six employees were thereafter fired by the manager for "economic reasons." A supervisor then complained to the manager that the company was losing some of its best employees. The supervisor was told that the company just had to "cut back." When the supervisor persisted in demanding an explanation, he, too, was fired for "economic reasons." In upholding the Board's Decision that the supervisor was not covered by the Act,[2] the District of Columbia Circuit spoke as follows:

---

**2.** The Board overruled its prior decisions holding that an employer's discipline of a supervisor

which was "an integral part" of a plan, or part of a "pattern of conduct," designed to interfere

Under the Act, supervisors are explicitly excluded from the definition of "employee." 29 U.S.C. § 152(3) (1976). As the Supreme Court has recognized, this fact entitles an employer to insist on the loyalty of his supervisors and means that a supervisor is not free to engage in activity which, if engaged in by a rank-and-file employee, would be protected. *There are three basic exceptions to this rule, however, in which an employer's conduct towards a supervisor has been found to violate section 8(a)(1) of the Act:* 1) where a supervisor is disciplined for testifying before the Board or during the processing of an employee's grievance; 2) where a supervisor is disciplined for refusing to commit an unfair labor practice; and 3) where a supervisor who hired his own crew was discharged as a pretext for terminating his pro-union crew.

711 F.2d at 386 (citations omitted) (emphasis added).

In *Howard Johnson*, however, a supervisor who was discharged because she refused to engage in espionage of union organizational activities was reinstated. The Board concluded that the company's demand of the supervisor was an unfair labor practice. In that case, the First Circuit upheld the Board's decision and made the following comment:

The National Labor Relations Act does not afford protection to supervisors and therefore does not prohibit an employer from discharging a supervisor for her own union activity. Nonetheless, if an employer's actions toward a supervisor interfere with, coerce, or restrain statutorily protected employees in the exercise of their section 7 rights, the employer is guilty of an unfair labor practice.

702 F.2d at 4 (citations omitted).

Additionally, in *Gerry's Cash Market*, a violation of the Act was found where a supervisor was demoted because he refused to enforce an overly broad no-solici-

tation rule aimed at curtailing union organizational activities. The Board found that his demotion violated section 8(a)(1) of the Act. The First Circuit upheld the Board's order and spoke as follows:

The underlying theory is not, of course, that the Act protects the supervisor, which it does not, nor even that disciplining a supervisor for union activities instills fear in rank-and-file employees that their own protected union activities may subject them to a similar fate. Rather, the theory is that if employers are allowed to force supervisors to engage in unfair labor practices, this necessarily results in direct interference with the affected rank-and-file employees in the exercise of their § 7 rights.

602 F.2d at 1023 (citations omitted).

Finally, in *King Radio*, the employer disciplined supervisors who testified adversely to the employer in a hearing before a Trial Examiner concerning, *inter alia*, the discharge of certain employees for union activity. In upholding the Board's decision that the employer in disciplining the supervisors violated the Act, this court commented as follows:

Did the action of King in discharging Jones and placing Walker on probation, because they appeared and testified adversely to King at the hearing in No. 9601, and placing Cesar on probation, because she appeared at the hearing and was willing to testify to facts adverse to King, violate § 8(a)(1) of the Act?

To constitute such a violation, such conduct must have violated the rights of King's employees, other than supervisors, since a supervisor is not "an employee," as that term is defined in 29 U.S.C.A. § 152(3), and § 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1), applies only to employees.

Section 8(a)(1) of the Act reads:

"(a) It shall be an unfair labor practice for an employer—

---

with an employee's Section 7 rights violated Section 8(a)(1). The Board indicated, however, that there were other situations where an employer's discipline of a supervisor would violate

Section 8(a)(1), none of which had application to the supervisor in *Automobile Salesmen's Union*.

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \*"

The language of § 7 of the Act warrants the implication that it includes the right to the remedies provided by the Act for the enforcement of the rights specifically guaranteed by that section. Were it otherwise, the Congressionally declared purposes of the Act would be frustrated.

An important part of such remedies is the right to have supervisors who have knowledge of pertinent facts appear and testify in a Board proceeding, without such supervisors risking retaliatory action on the part of their employer if their testimony is adverse to it.

398 F.2d at 21–22 (footnote omitted).

 In the instant case, Kelley was discharged because he refused to falsify termination slips by showing pretextual reasons for employee discharges which, if made, would have tended to thwart the discharged employees' efforts to obtain redress under the Act.[3] Accordingly, we uphold the Board's action finding Kelley's discharge a violation of the Act.

Decision affirmed and the Board's Order shall be enforced.

---

**3.** Country Boy's reliance on the Board's Decisions in Buddies Super Markets and Harvey's Wagon Wheel, Inc., appears misplaced. In *Buddies Super Markets,* 223 NLRB 950 (1976), a supervisor's superior advised the supervisor that the employer was "building a case" against an employee who had signed a union card eighteen months before, but that the supervisor should treat this information as "confidential." Instead, the supervisor informed the employee in question, whereupon the supervisor was fired.

The Board upheld the ALJ's ruling that in discharging the supervisor the employer violated the Act. In *Harvey's Wagon Wheel,* 236 NLRB 1670 (1978), the Board agreed with the ALJ's finding that the evidence was simply insufficient to show that the supervisor was fired for refusing to surveil union activities or otherwise "stem the flow of union activities on the swing shift." Accordingly, the supervisor's reinstatement was not ordered.