HI–CRAFT CLOTHING CO., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 80–2595.

United States Court of Appeals, Third Circuit.

Argued Aug. 5, 1981.

Decided Oct. 1, 1981.

Frank H. Gelman (argued), Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for petitioner; Stephen A. Bokat, Washington, D. C., of counsel.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Christine Weiner (argued), N.L.R.B., Washington, D. C., for respondent.

Stephen E. Tallent, William J. Kilberg, Washington, D.C. (argued), Dennis A. Gladwell, Mark Wm. Shurtleff, Newport Beach, Cal., Gibson, Dunn & Crutcher, Washington, D. C., for the Chamber of Commerce, amicus curiae.

Before ALDISERT and WEIS, Circuit Judges, and RE,* Chief Judge.

* Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The National Labor Relations Board ordered reinstatement of a supervisor who had been discharged because of his threat to institute Board action against his employer. Despite the fact that the National Labor Relations Act excludes supervisors from its ambit, the Board contends that enforcement of the right of access to its procedures justifies an expansive interpretation of its authority. We reject that statutory interpretation and, concluding that the Board had no jurisdiction, deny enforcement of its order.

James J. Jiorle charged that he had been dismissed by his employer, Hi-Craft Clothing Company, in violation of § 8(a)(4) of the Act. After a hearing, an Administrative Law Judge recommended that Jiorle be reinstated with back pay. A three member panel of the Board, one member dissenting, adopted the ALJ's recommendations.

At the hearing, the parties stipulated that Jiorle was a supervisor. The ALJ resolved some factual disputes about events that had occurred, and found that the controversy centered on whether Hi-Craft had promised to pay Jiorle a $1,000 annual bonus when he was hired. For two years in succession, Jiorle received only $500, and he was convinced that Hi-Craft was reneging on its agreement. When the company proposed a profit sharing arrangement instead of the bonus, he became indignant and said he was "going to the Labor Board" to see what could be done to help him. Once the company owners realized that Jiorle was serious, he was discharged.

The ALJ found that the reason for Jiorle's termination soon became known to the other employees, and that Hi-Craft could reasonably have expected this to occur. Although acknowledging that as a supervisor Jiorle was not entitled to protection under the National Labor Relations Act, the ALJ held that the company's ac-

tion produced a coercive effect on the employees' right of free access to the Board and in their exercise of other guarantees provided by the Act. The ALJ also accepted General Counsel's alternative argument that even supervisors should be protected when seeking to invoke the Board's processes. The Board agreed with the latter point, relying on its earlier decision in *General Services, Inc.*, 229 N.L.R.B. 940 (1977), *enf. denied*, 575 F.2d 298 (5th Cir. 1978),[1] and said that "it is the Board's function, and not the employer's, to decide whether the individual is covered by the Act and his claim has merit."

Dissenting Member Truesdale pointed out that in the *General Services* case, a divided Board had in effect adopted a subjective approach by extending protection to a supervisor who was unsure of his status. As the dissenting opinion noted, this was contrary to the objective standard used in other areas, such as those in which the Board determines whether an employer violated § 8(a)(3) by discharging an alleged supervisor. In that line of cases, subjective good faith is irrelevant—the parties proceed at their own risk. The dissent also observed that "access to the Board is not an incantation that can somehow transform a supervisor into an employee and confer statutory rights upon a class of individuals that Congress has expressly excluded from the Act's coverage."

In addition to its contentions that factual matters were improperly resolved against it, the employer on appeal argues that the Board had no jurisdiction to act because the supervisor was acting only on his own behalf. In seeking enforcement, the Board contends that promoting unimpeded access to its processes requires that any person seeking assistance be protected—including a supervisor who is not otherwise covered by the National Labor Relations Act. In conclusion, the Board urges that its interpretation of the Act be accepted as "permissible if not actually required."

I

We begin with the question often presented in administrative appeals—the deference a reviewing court should accord to an agency's statutory interpretation. The respect required in a given case may be determinative of the outcome, for if great weight is given to an agency's interpretation, it must be given effect even if the court would have decided otherwise in the first instance. *NLRB v. United Insurance Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). The reviewing court's role is an uncertain one despite the fact that the Administrative Procedure Act provides that "the reviewing court shall decide all relevant questions of law, [and] interpret constitutional and statutory provisions. . . ." 5 U.S.C. § 706 (1976).

---

1. In its opinion the Board cited the decision in its own reports, but failed to indicate that the Court of Appeals for the Fifth Circuit, in an unpublished opinion, disagreed with the Board's reasoning and refused to enforce the order. Incomplete citations of this nature are misleading to the reader and are subject to justifiable criticism.

The failure to cite the Court of Appeals decision may be an indication of the Board's feeling that it should apply its own rulings on a national basis, and that it therefore will not defer to the reviewing courts. The theory may be that the Board would prefer to have uniform agency rulings in effect across the country despite contrary court holdings. This is an approach similar to that adopted by the Internal Revenue Service and the Postal Service. Indeed, in at least one instance, the Board has refused to abide by a ruling from this court in a subse-

quent case in which the same legal point was at issue. *Allegheny General Hospital v. NLRB*, 608 F.2d 965, 968–69 (3d Cir. 1979).

We suggest that in most situations, a far better approach for an administrative agency would be to accept the first ruling of a court of appeals on a particular point or else seek reversal in the Supreme Court or a statutory change by Congress. To shop in a number of courts of appeals in hopes of securing favorable decisions is not only wasteful of overtaxed appellate resources but dissipates agency energies as well. This shopping practice should be subjected to searching and critical review. *See Goodman's Furniture Co. v. United States Postal Service*, 561 F.2d 462, 465 (3d Cir. 1977) (Weis, J., concurring); *cf. American Medical International, Inc. v. HEW*, No. 79–1460, slip op. at 10–13 (D.C.Cir. Aug. 14, 1981).

Early in the history of American administrative law, the Supreme Court took a restrictive view of the respective functions of agency and reviewing court. In *Federal Trade Commission v. Gratz*, 253 U.S. 421, 427, 40 S.Ct. 572, 574, 64 L.Ed. 993 (1920), the Court said, "The words 'unfair method of competition' are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine as a matter of law what they include." That flat statement, however, eventually gave way to an approach that gave deference to an agency on the theory that it was the instrumentality created by Congress to carry out a policy expressed in broad statutory terms. Thus, in 1948, the Court in another FTC case said that it would give "great weight to the Commission's conclusion" that certain conduct was an "unfair method of competition." *FTC v. Cement Institute*, 333 U.S. 683, 720, 68 S.Ct. 793, 812, 92 L.Ed. 1010 (1948).

Application of this deferential standard, however, has not been consistent, even with respect to particular agencies. The acceptance given decisions of the NLRB by the Supreme Court has hardly been steadfast, and the passage of time has not revealed a trend toward one preferred position. In *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 303, 97 S.Ct. 576, 580, 50 L.Ed.2d 494 (1977), for example, the Court acquiesced in the Board's contention as "a reasonable interpretation of the statute," consistent with the Board's prior holdings and the Secretary of Labor's construction, even though the issue could have, with equal reason, been resolved either way.

Similarly, *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944), said a Board determination that "specified persons are 'employees' under this Act is to be accepted if it has 'warrant in the record' and a reasonable basis in law." *Accord NLRB v. United Insurance Co.*, 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). In *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978), the Court cautioned "[t]he judicial role is narrow:

The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced." (footnote and citations omitted).

On the other side are cases such as *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 499, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960), where the Court declined the opportunity to expound a detailed delineation of the respective functions of court and agency, and said, "We think the Board's resolution of the issues here amounted not to a resolution of interests which the Act left to it for case-by-case adjudication, but to a movement into a new area of regulation which Congress had not committed to it. Where Congress has in the statute given the Board a question to answer, the courts will give respect to that answer, but they must be sure the question has been asked."

In *American Ship Building Co. v. NLRB*, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), the Court refused to yield to the Board's finding of an unfair labor practice when an employer "locked out" its employees after a bargaining impasse had been reached. The Court was "unable to find that any fair construction of the provisions relied on by the Board in this case can support its finding of an unfair labor practice. Indeed, the role assumed by the Board in this area is fundamentally inconsistent with the structure of the Act and the function of the sections relied upon." *Id.* at 318, 85 S.Ct. at 967. *See also NLRB v. Yeshiva University*, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980).

Further citations to cases on the topic would only serve to confirm Judge Friendly's observation in *Pittston Stevedoring Corp. v. Dellaventura*, 544 F.2d 35 (2d Cir. 1976), *aff'd sub nom. Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977), that it is time to recognize that there are two lines of Supreme Court decisions on the subject

which are analytically in conflict "with the result that a court of appeals must choose the one it deems more appropriate for the case at hand." *Id.* at 49 (footnote omitted).

After the Supreme Court affirmed the *Dellaventura* case without referring to Judge Friendly's comments, Professor Kenneth Culp Davis wrote, "The Supreme Court evidently has made a deliberate choice to let its two lines of cases continue to stand." Thus, "[t]he answer to the question whether the Court will use the rational basis test on a problem of applying law to established or undisputed facts is yes and no, with no guide as to when it is yes and when it is ·no."[2] K. Davis, Administrative Law of the Seventies 311–12 (1980 Supp.).

A canvass of the authorities at least makes one point clear. A reviewing court may not simply abdicate its responsibility by mumbling an indiscriminate litany of cases that extends "great deference to administrative conclusions." There is more to the judicial role. "Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965).

█ In determining what degree of deference is appropriate, an appraisal of several factors should be made. In some cases, a distinction has been made between whether the issue is factual or legal. If the latter, then one may expect less deference to the agency and a more independent review by the courts. The difficulty that emerges, however, is that it is not always easy to detect the line between legal and factual issues in an administrative proceeding. *See generally,* W. Gellhorn & C. Byse, Administrative Law 251–57 (7th Ed. 1979). In most instances, the matter is one of "mixed law and fact."

The law-fact test has been criticized as being "too simplistic," *United States v. The J. B. Williams Co.*, 498 F.2d 414, 431 (2d Cir. 1974), *quoting Artvale, Inc. v. Rugby Fabrics Corp.*, 363 F.2d 1002, 1005 (2d Cir. 1966), and Professor Davis maintains that in recent years there has been a deemphasis in the distinction between the two. He comments that the majority and the dissenters on the Supreme Court may reach opposite conclusions by choosing between the two tests without explaining why either is correct. K. Davis, Administrative Law of the Seventies § 30 (1976).

Nevertheless, utilization of the dichotomy still has some value and in a situation where there are no factual disputes, there is a tendency toward a less inhibited approach by the courts. Thus, in *Consumer Product Safety· Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 120, 100 S.Ct. 2051, 2062, 64 L.Ed.2d 766 (1980), the Court refused to accept an administrative agency interpretation, saying, "This case presents a narrow legal issue that is readily susceptible of judicial resolution."

At times, the nature of the question determines the standard to be applied. If the

---

**2.** The extent to which courts should substitute their judgment for that of an agency is an underlying problem which has not adequately been resolved and cannot be done here. Professors Davis and Jaffe present diverging views on this point.

In Davis' assessment, the Supreme Court's continuance of inconsistent lines of cases is an indication of the Court's preference for its own unguided discretion in each case. This unacknowledged discretionary power, according to Davis, however, is not necessarily undesirable. K. Davis, Administrative Law of the Seventies 312 (1980 Supp.).

Professor Jaffe, on the other hand, is of the opinion that judicial review of administrative action should be "cautionary," and advocates a "clear purpose" of the statute as the standard of review to be employed. According to Jaffe, "What it means very simply ... is that where *Judges* are themselves *convinced* that a certain reading, or application, of the statute is the *correct*—or the only *faithful*—reading or application, they should intervene and so declare. Where the result of their study leaves them without a definite preference, they can and often should abstain if the agency's preference is 'reasonable.'" L. Jaffe, Judicial Control of Administrative Action 572 (1965). For a discussion and critique of these views, *see Perfecting the Partnership: Structuring the Judicial Control of Administrative Determinations of Questions of Law,* 31 Vand.L.Rev. 91, 116–19 (1978).

issue falls outside the area generally entrusted to the agency, and is one in which the courts have a special competence, i. e., the common law or the constitutional law, there is little reason for the judiciary to defer to an administrative interpretation. *Piper v. Chris Craft Industries*, 430 U.S. 41 n.27, 97 S.Ct. 949 n.27 (1977); *Institute for Scientific Information, Inc. v. United States Postal Service*, 555 F.2d 128, 132 (3d Cir. 1977).

■ Even if the question does involve interpretation of a statute which is considered within the "specialized" knowledge of an administrative agency, the courts are still not free to relinquish their responsibility of judicial review. As the Court said in *American Ship Building Co.*, "The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." 380 U.S. at 318, 85 S.Ct. at 967. Blind acceptance of agency "expertise" is not consistent with responsible review.

When the agency diet is food for the courts on a regular basis, there is little reason for judges to subordinate their own competence to administrative "expertness." For example, the issues in social security disability cases are hardly unfamiliar to judges who try or review personal injury tort cases on a regular basis.

Recognition that an agency is not the exclusive repository of technical expertise may, in part, account for the Supreme Court's reluctance on occasion to accept the SEC's interpretation of the Securities Acts, a field in which the courts are often the forum for disputes between private litigants. As Justice Powell wrote in *International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America v. Daniel*, 439 U.S. 551, 566, n.20, 99 S.Ct. 790, 800, n.20, 58 L.Ed.2d 808 (1979), "deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose and history. On a number of occasions in recent years, this Court has found it necessary to reject the SEC's interpretation of various provisions of the Securities Acts." (citations omitted).

■ When, however, an agency has been entrusted with wide discretion in a technical area, such as the Truth in Lending Act, and Congress has specifically designated the agency as the primary source for the interpretation and application of the statute, a different standard often applies. There, "judges ought to refrain from substituting their own interstitial lawmaking for that of the [agency], so long as the latter's lawmaking is not irrational." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980).

■ Another important facet of administrative interpretation comes to the fore when the agency construes its own authorization statute. There the Court has been less inclined to be influenced by administrative constructions. In *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the restrictive approach is apparent:

"Although an agency's interpretation of the statute under which it operates is entitled to *some* deference, 'this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose and history.' *Teamsters v. Daniel*, 439 U.S. [551, 556] n.20, 99 S.Ct. 790, 800 n.20, 58 L.Ed.2d 808 (1979).... [E]ven if HEW has attempted to create such an obligation [of affirmative action] itself, it lacks the authority to do so."

*Id.* 442 U.S., at 411–12, 99 S.Ct., at 2369–70 (emphasis added).

In *FCC v. Midwest Video Corp.*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979), the same reservation was expressed. "Though the lack of congressional guidance has in the past led us to defer—albeit cautiously—to the Commission's judgment regarding the scope of its authority, here there are strong indications that agency flexibility was to be sharply delimited." *Id.* at 708, 99 S.Ct. at 1445. *See also Volkswagenwerk Aktiengesellschaft v. FMC*, 390 U.S. 261,

272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

The more intense scrutiny that is appropriate when the agency interprets its own authority may be grounded in the unspoken premise that government agencies have a tendency to swell, not shrink, and are likely to have an expansive view of their mission. Not surprisingly, therefore, an agency ruling that broadens its own jurisdiction is examined carefully.[3]

■ When the agency has participated in the legislative activity leading to its authorization, generally more respect will be accorded the administrative interpretation. If the construction is longstanding, it is often considered more authoritative because those who have had matters before the agency have come to rely upon its interpretation, *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974). Needless to say, however, if the construction is erroneous, mere repetition will not make it correct. *See FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 745, 93 S.Ct. 1773, 1784, 36 L.Ed.2d 620 (1973); *Institute for Scientific Research v. United States Postal Service, supra.*

## II

It is against this background that we reach the issue in this case. Section 8(a)(4) of the National Labor Relations Act makes it an unfair labor practice for an employer "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under the Act." 29 U.S.C. § 158(a)(4) (1976). Section 2(3) says that "employee" shall include any employee . . . but shall not include . . . any individual employed as a supervisor. . . ." 29 U.S.C. § 152(3) (1976).

## A.

A straightforward reading of these two portions of the statute leads to the conclusion that Jiorle, an admitted supervisor, is not protected, since he is expressly excluded under the definitional section. The Board, however, contends that the anti-discrimination section of the Act should be given a liberal construction to effect its purposes and relies upon *NLRB v. Scrivener*, 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972), and *Nash v. Florida Industrial Commission*, 389 U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967).

In *Scrivener*, the Supreme Court sustained the Board's position that § 8(a)(4) protected an employee who had given a written statement to a field examiner but had not filed a charge or testified at a formal hearing. Finding the approach to § 8(a)(4) generally to have been a liberal one designed to keep open channels of information to the Board, and finding no substantial countervailing considerations, the Court accepted that interpretation.

The Board places much emphasis on the broad language used in *Scrivener* and *Nash* in discussing § 8(a)(4), especially where the Court says that "all persons" must be free from coercion in reporting unfair labor practices to the Board. 389 U.S. at 238, 88 S.Ct. at 365. Although those cases did extend the scope of § 8(a)(4)'s protection beyond the precise wording of the statute, they did so for the benefit of an employee— an individual clearly within the Act's coverage.

More closely related is an earlier case from the Court of Appeals for the Fifth Circuit, where the court enforced an order requiring reinstatement of a supervisor who had testified before the Board on behalf of protected employees, *Oil City Brass Works v. NLRB*, 357 F.2d 466 (5th Cir. 1966). The court found that the retaliation imposed on the supervisor infringed the ability of employees to have him testify on their behalf and, accordingly, trenched upon the free exercise of their right to "a congressionally

---

**3.** As one commentator aptly observed: "It is basic that an administrative agency is a creature of statute, and can only act within the jurisdiction conferred by its enabling act. Although the courts will respect authorized agency action, an assumption of jurisdiction or action that is ultra vires and beyond the scope of the delegated authority will be set aside." Dickinson, Administrative Justice and Supremacy of Law 41 (1927).

provided, effective administrative process." It was this interference with the employees' § 7 rights that violated § 8(a)(1).

Several differences, however, exist between the *Oil City Brass Works* situation and that presented here. The court of appeals based its decision on the fact that employees' rights were affected, not just those of the supervisor. Secondly, the remedy was necessary because of a violation of § 8(a)(1), not § 8(a)(4) as in the case at hand. The issue confronting us—that of the right of a supervisor to invoke the protection of § 8(a)(4) with respect to a charge of his own, unrelated to employees of the company, thus has not been addressed by an appellate court in a published opinion.

The Board here relied on its own case, *General Services, Inc.,* in finding a violation of the Act. There, a man named McCracken, unsure of his status as a supervisor, filed a charge asserting that he had been dismissed because of union activity. A Board investigation revealed that he was indeed a supervisor and therefore had no remedy. However, the Board concluded that, for purposes of § 8(a)(4), he was to be considered an "employee" and the company could not refuse to reinstate him because he had initiated a charge. The opinion recited that the Taft-Hartley Amendment, which removed supervisors from the definition of "employees," did not change the wording of § 8(a)(4). Since supervisors in pre-Taft-Hartley days were within § 8(a)(4), therefore, the Board majority held that they continued to be so after the amendments of 1947. Significantly, the Court of Appeals for the Fifth Circuit, which had decided *Oil City Brass Works,* refused to enforce the order of reinstatement.

### B.

Because of the lack of authority in this area, we must conduct our own analysis of the legislative history and of related Board and Court precedent to determine whether the Board's conclusion can be justified. This necessitates a consideration of the remedial nature of § 8(a)(4) and the restrictive definition of employee that excludes supervisors in § 2(3).

In its early years, the Board followed a wavering course in determining whether supervisory personnel came within the coverage of the National Labor Relations Act. In *Packard Co. v. NLRB,* 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), the Court upheld the Board's contention that it had jurisdiction over supervisors. Congress disagreed, and promptly enacted the Taft-Hartley law amending the National Labor Relations Act.

The Senate and the House reports made it very clear that "[s]upervisors are management people. . . . They abandoned the 'collective security' of the rank and file voluntarily, because they believed the opportunities thus opened to them to be more valuable to them than such 'security.'" H.R.Rep.No. 245, 80th Cong., 1st Sess., 16–17 (1947). In disapproving the Board's interpretation, the House Report commented: "What the bill does is to say what the law always has said until the Labor Board, in the exercise of what it modestly calls its 'expertness,' changed the law: That no one, whether employer or employee, need have as his agent one who is obligated to those on the other side, or one whom, for *any* reason, he does not trust." *Id.* at 17 (emphasis in original).

In *NLRB v. Bell Aerospace Co.,* the Court reviewed this legislative history and rejected the Board's ruling that the agency had jurisdiction because certain buyers were not managerial employees. The Board was instructed to apply a more limited definition in keeping with the intent of the Taft-Hartley amendment to exclude managerial personnel. 416 U.S. at 289, 94 S.Ct. at 1769. Thus, in delineating the category of persons excluded, the Court construed the Amendment liberally. *Beasley v. Food Fair of North Carolina, Inc.,* 416 U.S. 653, 661–62, 94 S.Ct. 2023, 2027–28, 40 L.Ed.2d 443 (1974), employed a similar philosophy. There the Court held that remedies granted by the state to supervisors for discharges because of union membership were preempted by the Taft-Hartley Act.

In a third case, *Florida Power & Light Co. v. International Brotherhood of Electrical Workers*, 417 U.S. 790, 803–05, 94 S.Ct. 2737, 2743–45, 41 L.Ed.2d 477 (1974), the Court once again emphasized the statutory limitation by holding that the Board could not prevent a union from disciplining its supervisory members for performing bargaining unit work during a strike.[4] The majority did note a number of cases in the courts of appeals where the Board action in favor of supervisors had been approved, but only in instances where the discharges were found to have interfered with employee rights. When only the supervisor's interests are at stake, it is clear that the intent of the Taft-Hartley Amendments is to deny jurisdiction to the Board.

Although the ALJ accepted the theory that the employer's action inspired such fear that employees would hesitate to invoke their own rights, the Board does not rely on that approach and does not press it on appeal. In any event, that premise at best is of dubious validity, as the opinion in *Oil City Brass Works* convincingly demonstrates.

### C.

The legislative history and decisional law demonstrate convincingly that we should reject the Board's assumption of jurisdiction in this case and its quest for this court's "deference" to agency expertise. What is present here is an unadorned legal issue and, for present purposes, undisputed facts. This is not a question of the Board applying a broad statutory term to a specific set of facts, but is a case of straightforward statutory construction.

Although the Board is granted wide discretion because of its special competence in dealing with labor problems, there are limitations on that power when the agency is engaged in construing its own authority. In this instance, moreover, the Board's interpretation of §§ 2(3) and 8(a)(4) was not a longstanding one, but was of recent origin.

On a plain language basis, the thrust of the statute is clear: Section 2(3) excludes supervisors from the protection of the Act. Even were there an ambiguity, the legislative history makes it clear that Congress was in earnest in excluding such persons from coverage. The limited exception that *Oil City Brass Works* permitted does not exist here. No rank and file employees' interests were even tangentially at stake, but only Jiorle's personal grievance.

Once Jiorle's status was conceded, there was only one course for the Board to follow and that was to dismiss the claim. The Board had no authority to grant relief to Jiorle, just as a court has no power to adjudicate once it determines that it lacks jurisdiction over the merits. *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). The Board's power came to an end when its lack of jurisdiction became a matter of record. Devoid of power to adjudicate the merits of the underlying grievance because of the supervisor's status, it may not assert a power to protect its process—an abstract right to encourage, vindicate, or protect the right of access to its procedures.

The right of access to the federal courts for vindicating federal rights is more highly prized than access to any other federal institution. The article III courts constitute the citadel for the vindication of rights and privileges guaranteed by the Constitution, statutes, administrative regulations, and case law. But unless we have jurisdiction to adjudicate the underlying specific case or controversy, we cannot manufacture jurisdiction for the sole purpose of vindicating an abstract right of access to the court system. If an article III court cannot assume jurisdiction to protect an abstract right, a board which is the creature of limited statutory authority, *a fortiori*, cannot be said to possess such extensive power. Con-

---

4. In *American Broadcasting Co. v. Writers Guild of America*, 437 U.S. 411, 98 S.Ct. 2423, 57 L.Ed.2d 313 (1978), the Court did hold that the Board could prevent a union from disciplining supervisory members because of supervi-sory work performed during a strike. The rationale was that the union was interfering with employer rights of loyalty of managerial employees granted by § 8(b)(1)(B).

sequently, we will grant the petition for review and will deny the Board's petition for enforcement.