**Paul FRIEDRICH, Roger Hall, Tom Harahan, Richard Omvig, Roseanne Saunders, Richard Schaefer, Jack Wasneski, and Steve Zizza**

v.

**U.S. COMPUTER SERVICES, formerly named U.S. Computer Systems, d/b/a CableData.**

**No. 90–1615.**

United States District Court, E.D. Pennsylvania.

Sept. 3, 1991.

Denis M. Dunn, Mary Rogers Auchincloss, Media, Pa., for plaintiffs.

Alexia Kita Blake, Barnett Satinsky, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for defendant.

## MEMORANDUM & ORDER

GAWTHROP, District Judge.

Plaintiffs, Paul Friedrich, Roger Hall, Tom Harahan, Roseanne Saunders, Richard Schaefer, Jack Wasneski, and Steve Zizza, who are current or former employees of defendant, U.S. Computer Services, which operates under the name "CableData", brought this action against CableData seeking overtime compensation allegedly owed to them under the Fair Labor Standards Act, ("FLSA"), 29 U.S.C. §§ 201–219, and Pennsylvania law.[1] Defendant now moves for summary judgment, arguing that its pay practices are excluded from the overtime requirements of the FLSA, under the act's motor carriers' exemption, 29 U.S.C. § 213(b)(1). For the following reasons, I shall grant the motion.

## BACKGROUND

CableData is a privately held corporation that supplies computer hardware and software to cable television companies across the nation, providing maintenance and repair services for this equipment from five regional service centers. Plaintiffs are now or have been employed as field engineers by CableData, assigned to CableData's Northeast Region Office, located in Broomall, Pennsylvania. This office services customers in Pennsylvania, New York, New Jersey, Delaware, Maryland, the District of Columbia, Virginia, West Virginia, and other states when needed.

Field engineers drive to customer sites in these states to install, maintain, or repair computer hardware provided by CableData. If those sites are within four to six hours' drive, field engineers drive their own cars; to service more distant sites, they travel by air, driving rental automobiles from the nearest airport. When traveling to a customer site, field engineers carry a tool kit provided by CableData[2] and, depending on the trip, they may also carry various expendable parts and equipment.[3] *See gener-*

---

**1.** Plaintiffs bring their state claims under the Pennsylvania Minimum Wage Act, ("PMWA"), 43 P.S. § 333.101, *et seq.*, and the Pennsylvania Wage Payment and Collection Law, ("WPCL"), 43 P.S. § 260.1, *et seq.*.

**2.** The tool kit contains approximately 75 tools and weighs approximately thirty-five pounds. *See* Defendant's Memorandum at 11; Exhibit SZ–19 to Deposition of Steve Zizza.

**3.** Defendant states that field engineers transport, *inter alia,* "expendable repair parts (such as fuses, belts, transistors, ribbons, springs, gears and drive rollers), ... personal computer boards, Tandem boards, modems, parts kits, parts caddies, disk kits, including Winchester kits, which are used to repair Winchester disk drives, and cathode ray tubes (CRTs)". *See* Affidavit of Joseph LaGrossa, ¶ 11. Plaintiffs admit often carrying small expendable replacement parts, and very rarely a personal computer board or tandem board, *see* Responses to Requests for Admissions, No. 10 (Friedrich, Hall, Omvig, Wasneski), No. 8 (Harahan, Schaefer, Saunders, Zizza), but assert that all other parts and equipment are shipped directly by CableData. *Id.,* Nos. 9, 12, 15, 16 (Friedrich, Hall, Om-

*ally* Plaintiffs' Responses to Requests for Admissions, Nos. 8–17 (Friedrich, Hall, Omvig, and Wasneski), Nos. 6–15 (Harahan, Saunders, Schaefer, and Zizza). CableData ships computer hardware and substantial replacement parts directly to the customer site. *Id.*

The issue for the court is whether plaintiffs' interstate service visits, transporting tool kits and expendable parts in their own vehicles and rental vehicles, subjects them to the regulatory authority of the United States Department of Transportation ("DOT") under the Motor Carriers Act, 49 U.S.C. § 3102, and thus exempts them from the requirements of the FLSA. I conclude that it does.

## DISCUSSION

### I. *Legislative History*

Congress enacted the Motor Carriers Act in 1935, to promote economy, efficiency, and safety in the burgeoning motor transportation industry. *See* Act of August 9, 1935, 49 Stat. 543, c. 498, § 202(a); *see also United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 538–9, 60 S.Ct. 1059, 1061–2, 84 L.Ed. 1345 (1940). To that end, the Act gave the Interstate Commerce Commission, ("ICC"), authority to establish various requirements for "common carriers" and "contract carriers" by motor vehicle, including requirements for recordkeeping, safety of equipment, safety of operation, and "qualifications and maximum hours of service of employees." *See* 49 U.S.C. § 304(a)(1) & (2) (repealed). The Act also provided that the ICC could set similar "qualifications and maximum hours of service" for employees of "private carriers" by motor vehicle, if the ICC found that such requirements were needed to further "safety of operation". *See* 49 U.S.C. § 304(a)(3) (repealed).

In 1938, Congress passed the Fair Labor Standards Act, to protect workers from substandard wages and oppressive working hours. *See Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 739, 101 S.Ct. 1437, 1444, 67 L.Ed.2d 641 (1981).

The FLSA established the forty-hour work week, and it required employers to compensate employees at one and one-half times their standard hourly wages for time worked per week in excess of forty hours. *See* 29 U.S.C. § 207(a)(1). However, the FLSA specifically exempted from these overtime requirements, all "employees with respect to whom the [ICC] has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49." *See* 29 U.S.C. § 213(b)(1).

Congress thus provided that regulatory jurisdiction under the Motor Carriers Act and the FLSA would not be overlapping: where the ICC already had power to set maximum hours for workers, the FLSA would not apply. *See Levinson v. Spector Motor Co.*, 330 U.S. 649, 662, 67 S.Ct. 931, 938, 91 L.Ed. 1158 (1947). Congress apparently determined that regulation of working hours for employees of motor carriers was best left exclusively under the safety program that the ICC was developing for the motor carrier industry. *Id.* at 661, 67 S.Ct. at 938.

In 1966, Congress transferred the authority to regulate under § 304 of the Motor Carriers Act from the ICC to the Department of Transportation, ("DOT"). *See* Act of Oct. 15, 1966, P.L. 89–670, § 6, 80 Stat. 937; 49 U.S.C. § 1655(e)(6)(C). In 1983, as part of a sweeping revision and reenactment of the nation's transportation laws, Congress repealed § 304. *See* Act of Jan. 12, 1983, P.L. 97–449, § 7(b), 96 Stat. 2444; *see also* Act of Oct. 17, 1978, P.L. 95–473, 92 Stat. 1337, 1466 (repeal and revision of related statutory sections). Congress then recodified § 304, without substantive change, as 49 U.S.C. § 3102. That section provides, in relevant part, that:

> The Secretary of Transportation may prescribe requirements for—
>
> (1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and
>
> (2) qualifications and maximum hours of service of employees of, and stan-

vig, Wasneski), 7, 10, 13, 14 (Harahan, Schaefer, Saunders, Zizza).

dards of equipment of, a motor private carrier, when needed to promote safety of operation

*See* 49 U.S.C. § 3102(b). Courts now treat the motor carriers' exemption of the FLSA as referring to § 3102. *See Peraro ex rel. Castro v. Chemlawn Services Corp.,* 692 F.Supp. 109, 112 n. 2 (D.Conn.1988).

Section 3102 gives the Department of Transportation authority to regulate "motor common carriers", "motor contract carriers",[4] and "motor private carriers". Common carriers are those that hold themselves out to provide transportation of persons or property for the general public. *See* 49 U.S.C. § 10102(14). Contract carriers are those that provide transportation of persons or property in accord with continuing agreements. *See* 49 U.S.C. § 10102(15). Private carriers are those that are neither common or contract carriers, and that (a) "transport property by motor vehicle"[5] in interstate commerce[6], (b) are the "owner, lessee, or bailee of the property", and (c) transport the property "for sale, lease, rent or bailment, or to further a commercial enterprise". *See* 49 U.S.C. § 10102(16).

CableData claims not to be a common or contract carrier, but rather to be a "motor private carrier", since CableData's field engineers transport, by motor vehicle across state lines, parts for sale, as well as tools to further a commercial enterprise. The statute literally requires no more. As a "motor private carrier", CableData would be subject to the regulatory authority of the DOT, and its employees would be exempt from the FLSA.

## II. *DOT Regulations*

The DOT, however, has not sought to regulate operations such as CableData's. The DOT has promulgated maximum hours of service for employees of motor carriers, including private carriers, as part of the

Federal Motor Carrier Safety Regulations, ("FMCSR"). *See generally* 49 C.F.R. § 395.1–395.15 (October 1, 1990). Yet these requirements apply only to drivers of commercial motor vehicles. *See* 49 C.F.R. § 395.3(a) (setting maximum hours for "drivers"); *and* 49 C.F.R. § 390.5 ("driver" defined as "any person who operates any commercial motor vehicle"). Under FMCSR, "commercial motor vehicles" are only those vehicles: (a) that have a gross weight in excess of 10,000 pounds, (b) that are designed to transport more than 15 passengers or (c) that are used in the transportation of hazardous materials. *See* 49 C.F.R. § 390.5.

There is no dispute here that the motor vehicles driven by plaintiffs in their duties as field engineers for CableData do not weigh more than 10,000 pounds. There is thus no question that current DOT regulations setting maximum hours for employees of motor carriers do not apply to plaintiffs. CableData asserts, however, that the DOT nevertheless retains the "power", under 49 U.S.C. § 3102, to regulate plaintiffs working hours, should it be so inclined.

### A. Regulatory Gap

■ That the DOT has not exercised its power to regulate does not mean that such power does not exist. *See Southland Gasoline Co. v. Bayley,* 319 U.S. 44, 63 S.Ct. 917, 87 L.Ed. 1244 (1943); *Marshall v. Union Pacific Motor Freight Co.,* 650 F.2d 1085, 1089 (9th Cir.1981). In *Southland,* a group of employees of private carriers urged the Supreme Court to determine that the ICC had no "power", under § 304, to regulate their working hours, because the ICC failed to establish regulations for private carriers. *See* 319 U.S. at 46, 63 S.Ct. at 918. Section 304 expressly gave the ICC authority to establish working hours for private carriers only "when *needed* to further safety of operation". (Emphasis add-

---

**4.** *"Motor carrier" is used in the Motor Carriers Act to mean "motor common carrier" and "motor contract carriers". See* 49 U.S.C. § 10102(13).

**5.** The Motor Carriers Act does not define "property". It does, however, define "motor vehicle"

broadly to include any "vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation ...". *See* 49 U.S.C. § 10102(17).

**6.** As defined by 49 U.S.C. § 10521(a).

ed). The employees argued that the ICC's failure to regulate, and concomitant failure to make a finding that regulation was necessary, meant that the ICC had no immediate power to regulate their working hours. The Court disagreed, holding that the necessity to make a finding of need before issuing regulations did not affect the existence of the power to regulate. *See* 319 U.S. at 48, 63 S.Ct. at 9.

Section 3102 similarly limits the DOT's power to regulate working hours of private carriers to situations where "needed to promote safety of operation". Yet since § 3102 recodified § 304 without substantive change, the holding of *Southland* is controlling. Thus, the DOT's failure to regulate, or more precisely, to find regulation necessary in a particular area, does not, of itself, mean that the DOT is without "power" to regulate, within the meaning of 29 U.S.C. § 213(b)(1).

### B. Jurisdiction Disclaimed

Of course, the converse may also be true. That the DOT has not acted to regulate operations like CableData provides evidence that the DOT does not believe it has authority to so act. The Supreme Court has held that the ICC's interpretation of the scope of its authority over motor carriers is to be accorded substantial weight. *See Levinson,* 330 U.S. at 662, 67 S.Ct. at 938; *American Trucking Association,* 310 U.S. at 549, 60 S.Ct. at 1067. Further, the Court has suggested that where the ICC specifically disclaims jurisdiction over a category of employees, the employees are subject to the FLSA. *See Boutell Service Co. v. Walling,* 327 U.S. 463, 471 n. 9, 66 S.Ct. 631, 635 n. 9, 90 L.Ed. 786 (1945); *see also Morris v. McComb,* 332 U.S. 422, 434, 68 S.Ct. 131, 137, 92 L.Ed. 44 (1947) (jurisdiction over employees found to exist where ICC issued no exemption).

The Ninth Circuit has followed this reasoning in two recent cases, holding that where the DOT exempts a category of employees from the FMCSR, the FLSA applies. *See Jones v. Giles,* 741 F.2d 245 (9th Cir.1984); *Newhouse v. Robert's Ilima Tours, Inc.,* 708 F.2d 436 (9th Cir.1983).

The *Newhouse* court addressed a claim for overtime compensation by drivers of a Hawaiian tour company. The ICC issued a certificate of exemption, under 49 U.S.C. § 304(a)(4a) (repealed 1983), to Hawaiian motor carriers, exempting them from the requirements of the Motor Carriers Act, from 1960 to 1974. That provision required the ICC to issue certificates of exemption to motor carriers or classes of motor carriers whose activities were confined to a single state and did not substantially affect interstate commerce. *See* 49 U.S.C. § 304(a)(4a). The court held that during the time the certificate was valid, the ICC, and later the DOT, had no power to regulate the Hawaiian drivers, and that the drivers were therefore entitled to overtime compensation under the FLSA. *Newhouse,* 708 F.2d at 440.

The *Jones* court addressed a similar claim by certain Washington state ambulance drivers. In 1954, the ICC concluded that ambulance services were outside the jurisdiction of the Motor Carriers Act. *See Jones,* 741 F.2d at 249, (citing *Lonnie W. Dennis,* 63 M.C.C. 66 (1954). The DOT then incorporated this exemption into its interpretation of the FMCSR. *Id.* at 249 (citing 40 Fed.Reg. 50,677 (1975) *and* 42 Fed.Reg. 60,080 (1977)); *see also* 39 C.F.R. § 390.3(f)(4). The DOT's determination compelled the *Jones* court to hold that the ambulance drivers were not subject to the authority of DOT, but rather were subject to the FLSA. *Id.* at 249.

### C. Lightweight Vehicle Exemption

Plaintiffs argue by analogy that the DOT's exclusion of lightweight automobiles—vehicles weighing 10,000 pounds or less—from the FMCSR amounts to a disclaimer of jurisdiction over such vehicles and their drivers. The difficulty with this argument is that the DOT has stated otherwise in published comments. *See* 53 Fed. Reg. 18,044 (May 19, 1988).

The DOT added the lightweight vehicle exemption to the current FMCSR after Congress enacted the Motor Carrier Safety Act of 1984. *See* Act of Oct. 30, 1984, P.L. 98–554, Title II, § 201 et seq., 98 Stat.

2832. This Act directed the DOT to issue various regulations to further safety in the operation of commercial motor vehicles,[7] *id.*, § 206(a), 98 Stat. 2834, 49 U.S.C. app. 2505, which the Act defined as vehicles with a "gross vehicle weight rating of 10,-001 or more pounds".[8] *Id.*, § 204(1), 98 Stat. 2833, 49 U.S.C. app. 2503.

Congress mandated that the DOT issue these new safety standards for commercial motor vehicles, out of belief that "more must be done to enhance motor carrier safety". *See* S.R. No. 424, 98th Cong., 2d Sess. 2 (May 2, 1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News at 4769, 4786. At the same time, Congress did not substantially alter the existing statutory provisions that allowed the DOT to regulate safety in the motor carrier industry. Congress did amend section 3102. *See* Act of Oct. 30, 1984, P.L. 98–554, Title II, § 206(h), 98 Stat. 2835; 49 U.S.C. § 3102(d). However, Congress simply added the requirement that the DOT "consider the costs and benefits" of any regulation issued under that section. *Id.* This requirement paralleled a similar requirement to consider costs and benefits, which was included in the new authorizing provision. *See* Act of Oct. 30, 1984, P.L. 98–554, Title II, § 206(c)(2), 98 Stat. 2834; 49 U.S.C. app. § 2505(c)(2).

Thus, although Congress was aware of § 3102 at the time it directed that new regulations be passed for commercial motor vehicles, Congress did not amend § 3102 to apply only to commercial motor vehicles. Upon issuing new regulations targeted at vehicles exceeding 10,000 pounds, the DOT recognized the "clear Congressional policy of applying available Federal motor carrier safety resources to larger vehicles". *See* 53 Fed.Reg. 18,044. Yet the DOT stated, citing 49 U.S.C. § 3102, that it "retain[ed] its authority to regulate lighter weight vehicles in the interest of safety." *Id.* In short, the DOT has not interpreted its authority under § 3102 to be limited by the Congressional mandate to regulate vehicles exceeding 10,-000 pounds.

### D. Passenger Automobile Exemption

Nevertheless, the DOT's statement that it retains authority over vehicles lighter than 10,000 pounds must be viewed in context. The statement was made in response to public comments which argued that twelve- and fifteen-passenger vans, weighing less than 10,000 pounds, should not be exempted from the regulations. *See* 53 Fed.Reg. 18,044. Although the DOT acknowledged that it "historically regulated all commercial motor vehicles engaged in interstate commerce", it justified the light-weight-vehicle exemption by stating that it had "long focused" its activities on "larger vehicles", because vehicles weighing less than 10,000 pounds "have operating characteristics similar to a large automobile and generally pose no greater safety risk ... when used on the highway." *Id.* The DOT further stated that it believed that regulation of these "lighter weight vehicles" was not "warranted" because "existing accident data do not reveal that passenger vans used to transport 15 or fewer passengers ... require the application of the FMCSRs to enhance the safety of their operation." *Id.* The DOT thus compared "lighter weight vehicles" to passenger

---

7. The DOT was directed to establish safety standards that ensure that
    (1) commercial motor vehicles are safely maintained, equipped, loaded, and operated:
    (2) the responsibilities imposed upon operators of commercial motor vehicles do not impair their ability to operate such vehicles safely;
    (3) the physical condition of operators of commercial motor vehicles is adequate to enable them to operate such vehicles safely; and
    (4) the operation of commercial motor vehicles does not have deleterious effects on the physical condition of such operators.

*See* 49 U.S.C.App. § 2505(a).

8. Congress exempted lighter weight vehicles "to focus enforcement efforts". *See* S.R. No. 424, 98th Cong., 2d Sess. 6 (May 2, 1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News at 4790. According to the Senate Report, Congress deemed lightweight vans and pickup trucks to be analogous to automobiles, "best regulat[ed] under State automobile licensing, inspection, and traffic surveillance procedures." *Id.*

automobiles; it did not say that the "lighter weight vehicles", over which it retained authority, included passenger automobiles.

Earlier, the DOT published a statement saying that the FMCSR would not be applied to the "incidental" transportation of property in passenger cars. *See* 42 Fed. Reg. 60,079 (Nov. 23, 1977). This statement appeared in a 1977 "interpretations manual", revising interpretations of the FMCSR published two years earlier. *See* 42 Fed.Reg. 60,078. The manual stated that because the FMCSR were designed primarily for "medium and heavy-duty commercial vehicles", and were in "many instances ... not suitable for passenger cars", the DOT "has not required compliance with the Regulations by private carriers of property insofar as they engage in the transportation of property in an incidental manner in passenger cars." [9] Plaintiff argues that the DOT thereby "exempted" the operation of passenger vehicles from the application of the Motor Carriers Act. *See* Plaintiff's Memorandum at 10.

■ I disagree. Although courts will accord deference to an agency's interpretation of its authority, *see generally Hi–Craft Clothing Co. v. N.L.R.B.,* 660 F.2d 910, 912–916 (3rd Cir.1981), there should be some indication that an agency was considering the scope of its authority before such deference is given. The DOT's statement about passenger automobiles is literally an interpretation of the FMCSR, rather than an interpretation of § 304 of the Motor Carriers Act. Nothing in the statement suggests that the DOT determined that the Motor Carriers Act cannot be read to cover, or was not intended to cover, commercial operations involving passenger cars. Absent some suggestion that the DOT was interpreting the scope of its authority under the Motor Carriers Act, it is impossible to say that the DOT's refusal to regulate amounts to anything more.

The Ninth Circuit cases, discussed above, are distinguishable. In *Newhouse,* the ICC exempted a group of motor carriers from the Motor Carriers Act, under the authority of a statutory provision, 49 U.S.C. § 304(a)(4a), which required the ICC to exempt motor carriers not engaged in interstate transportation. *See* 708 F.2d at 440. The exemption was thus necessarily a finding that the DOT had no jurisdiction to regulate.

In *Jones,* the DOT exempted ambulance drivers from the Motor Carriers Act, due to the nature of ambulance service. *See* 741 F.2d at 249 (citing 40 Fed.Reg. 50,677 (1975) *and* 42 Fed.Reg. 60,080 (1977)). It is not clear that the DOT based this exemption on a perceived limitation in its authority. However, the Ninth Circuit interpreted the regulations as such. *See Jones,* 741 F.2d at 249 (citing the rule of deference to agency interpretation). The *Jones* court noted that ambulance service is not the type of transportation requiring national regulation, and is thus not a form of transportation over which the Motor Carriers Act was intended to apply. *See* 741 F.2d at 249–250.

In the present case, the DOT currently exempts passenger cars, and all other lightweight motor vehicles from the FMCSR, not because the DOT determined it was powerless to regulate these vehicles, but because, in 1984, Congress directed it to focus on vehicles weighing 10,000 pounds or more. The reasons for the passenger-vehicle exemption announced in 1977 are less clear. The DOT apparently *recognized* then that different regulatory concerns arise with respect to the trucking industry and the transportation of property in passenger cars. The DOT further recognized that the FMCSR, "designed primarily to apply to medium and heavy-duty commercial vehicles", were not always "suitable" for passenger cars. *See* 42 Fed.Reg. 60,-

---

9. The relevant paragraph states:
*Passenger automobiles.* The Safety Regulations were designed primarily to apply to medium and heavy-duty commercial vehicles, and in many instances the Regulations are not suitable for passenger cars. Various parts of the FMCSR contain exemptions for the opera-

tion and driving of passenger automobiles. The Bureau [of Motor Carrier Safety], therefore, has not required compliance with the Regulations by private carriers of property insofar as they engage in the transportation of property in an incidental manner in passenger cars.

079. However, the DOT did not link this statement to its authorizing statute, nor did it otherwise announce that it was examining the scope of its authority.

### III. *Judicial Interpretation of Motor Carriers Act*

Plaintiffs similarly do not point to any language in the Motor Carriers Act, or any circumstances of relevant legislative history, to support their assertion that the DOT is without authority to regulate the commercial use of passenger cars in interstate transportation. Limitations on the authority of the DOT that have been recognized in previous judicial interpretation of the Motor Carriers Act appear inapplicable.

In *American Trucking Association,* 310 U.S. at 534, 60 S.Ct. at 1061, the Supreme Court was called upon to interpret the word "employees" in § 304. That section literally gave the ICC the authority to set maximum hours for all employees of motor carriers, whether or not the employees were involved in the transportation end of the operation. Finding that the Motor Carriers Act was enacted in large part to improve safety in transportation, the Court held that the Act was intended only to grant the ICC power to set maximum hours of service for "those employees whose activities affect the safety of operation." *See* 310 U.S. at 553, 60 S.Ct. at 1069. The court subsequently determined that the ICC would not have authority over a clerk who was not involved in transportation activities, *see Levinson,* 330 U.S. at 660, n. 11, 67 S.Ct. at 937, n. 11, but had authority over a terminal foreman, whose duties as a loader of trucks affected safety of operation. *Id.,* at 685, 67 S.Ct. at 949.

There is no question that plaintiffs, as drivers, are or were engaged in activities affecting the safety of CableData's transportation operation. However, it might be argued that a different safety-related limitation should be placed upon the Act's use of the word "carrier".

Highway safety, in terms of the safety of drivers, passengers, and other travellers, is affected differently by commercial trucking and busing than by individuals driving personal automobiles. In passing the Motor Carriers Act, Congress was apparently concerned primarily with the dangers of trucks and buses, rather than the dangers of cars. To the extent that plaintiffs' transportation of parts and tools is more analogous to an individual's transportation of groceries, than to a shippers' transportation of produce, it does not involve the heightened dangers of shipping and is arguably outside the DOT's regulatory jurisdiction.

This argument is supported by other judicial opinions recognizing a *de minimis* exception to application of the Motor Carriers Act. *See Pyramid Motor Freight Corp. v. Ispass,* 330 U.S. 695, 708, 67 S.Ct. 954, 960, 91 L.Ed. 1184 (1947); *Sinclair v. Beacon Gasoline Co.,* 447 F.Supp. 5, 11 (W.D.La.1976). In *Pyramid Motor Freight* the Supreme Court noted that while loaders of freight affect safety of operation and thus are covered by the Motor Carriers Act, *see Levinson,* 330 U.S. at 649, 67 S.Ct. at 932, persons who merely handle freight before or after loading perform tasks that may be too "trivial, casual, or occasional" to affect safety and bring them under the Act's authority. *See Pyramid Motor Freight,* 330 U.S. at 708, 67 S.Ct. at 960.

Plaintiffs might argue here that their transportation of property is too minimal to make CableData a "carrier" within the meaning of the Motor Carriers Act. Plaintiffs' primary goal in driving to customer sites is to transport themselves to service customer equipment. The transportation of tools and expendable parts, while necessary to allow plaintiffs to provide servicing and repairs, is subordinate to this goal.

Ultimately, however, I find these arguments unpersuasive. In *Amercan Trucking Association,* the Supreme Court placed a judicial limitation on the use on the meaning of the word "employee" in the Motor Carriers Act, and after noting that Congress left the word undefined and did not use it as a term of art. *See* 310 U.S. at 545, and n. 29, 60 S.Ct. at 1065, and n. 29. In the present case, "motor private carrier"

is specifically defined, *see* 49 U.S.C. § 10102(16), and has been since the Act's initial enactment. *See* 49 U.S.C. § 303(a)(17). The definition does not limit "carriers" to those persons who ship property of a certain size or amount, or to those persons who ship property as their principal business. Rather it includes all persons, who, *inter alia,* transport property, "to further a commercial enterprise". *See* 49 U.S.C. § 10102(16); 49 U.S.C. § 303(a)(17).

Further, an exception for persons who transport property incident to field service has not been recognized by the courts. *See Chemlawn Services Corp.,* 692 F.Supp. at 109; *Sinclair,* 447 F.Supp. at 5; *Harshman v. Well Service, Inc.,* 248 F.Supp. 953 (W.D.Pa.1964). In each of these cases, federal courts found that persons who transported property for use in field service were "carriers" within the meaning of the Motor Carriers Act. *See Chemlawn,* 692 F.Supp. at 111–114, (carpet cleaners who drive specially equipped truck to customer sites to clean carpets are covered by Motor Carriers Act); *Sinclair,* 447 F.Supp. at 5–8 (employee who drives truck with tools, equipment, and supplies to service and maintain pipeline system is covered by Motor Carriers Act); *Harshman,* 248 F.Supp. at 955, 959 (employees who drive cement pumping trucks to customer sites to cement gas wells are covered by Motor Carriers Act).

▬ In each of these cases, the relevant employees drove trucks and transported considerably more tools and equipment than the plaintiffs in the present case. Nevertheless, these cases are relevant to the extent that they hold that employees are within the reach of the Motor Carriers Act if they carry property in interstate transportation, even though they are not employed primarily as carriers. Further, the fact that the employees in these other cases carried more tools and equipment on their service runs does not mean that plaintiffs do not carry enough property to come within the jurisdiction of the DOT. Plaintiffs carry 35–pound tool kits and various parts that are essential for performance of their service duties. I am unable to find that this cargo is so trivial or insubstantial that it does not constitute "property" within the meaning of the Motor Carriers Act.[10]

### IV. *Conclusion*

This is a troubling case. It is quite unlikely that Congress contemplated operations such as CableData's when enacting and reenacting the Motor Carriers Act, giving the ICC, and subsequently the DOT, the authority to set maximum hours of employment for motor carriers' employees. Further, given the more recent enactment of the Motor Carriers Safety Act of 1984, and the direction therein that the DOT focus on commercial motor vehicles weighing 10,000 pounds or more, it is equally unlikely that the DOT will use the regulatory authority of § 3102 to establish maximum hours of employment that cover CableData's field engineers. However, the language of the Motor Carriers Act apparently gives the DOT that authority, and the DOT has not specifically determined otherwise.

Thus, until Congress acts to limit the power of the DOT over private carriers by personal car, or until the DOT determines clearly that it is not authorized to regulate personal cars, I must to follow the language of the statute. A literal reading here is not clearly unreasonable, or inconsistent with Congressional goals. CableData field engineers work irregular hours, spending much time on the road, commuting to and from job sites. They are not unlike other drivers for motor carriers who unquestionably fall within DOT's jurisdiction over safety in interstate transportation.

---

**10.** I am mindful that exemptions to the FLSA are to be narrowly construed. *Mitchell v. Kentucky Finance Co.,* 359 U.S. 290, 295, 79 S.Ct. 756, 759, 3 L.Ed.2d 815 (1959). However, this general maxim is alone insignificant if the broad and specific language of an exemption admits no clear principled means for narrowing. Further, this maxim is less applicable here where the exemption is not a removal of regulatory authority, but a recognition of such authority in the hands of another agency.

I conclude, therefore, that defendant's motion for summary judgment must be granted, with respect to plaintiff's federal claims. I reserve decision on the motion with respect to plaintiffs' state claims, pending a filing by the defendant clarifying the effect of this decision on those claims, and any other ground offered as grounds for judgment with respect to the state claims.